**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2012-KA-01581-SCT**

*LEEVESTER BROWN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/21/2012 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| TRIAL COURT ATTORNEYS: | WILLIAM GRESHAM |
| | A. LESLIE FLINT |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEPHANIE B. WOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/11/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. LeeVester Brown was arrested and indicted for the capital murder of his son, Le'Anthony Brown, in violation of Mississippi Code Section 97-3-19(2)(f). The jury found him guilty and sentenced him to life in prison without parole. Brown appeals to this Court, arguing, among other things, that the trial judge improperly denied his request for expert funds. We agree, and we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

### *Le'Anthony's Death*

¶2.   After dating for two years, Brown and Shirley Myles married in 2002 and lived in Clarksdale.  Le'Anthony was born on September 22, 2002, following a planned pregnancy. Myles had problems during her pregnancy, including high blood pressure.  Because of those problems, Myles was taken to the University of Mississippi Medical Center ("UMMC") by ambulance to have labor induced.  Le'Anthony was born approximately six weeks early and stayed in the hospital in Jackson for about three weeks, before being transferred to a hospital in Clarksdale.  Le'Anthony stayed in the hospital in Clarksdale a couple more weeks before going home with Brown and Myles.  Myles had two children from a prior marriage, Lester and Jureau, and they also lived in the home with Brown, Myles, and Le'Anthony.[1]

¶3.   At the time of Le'Anthony's death, Myles worked at the Aaron Henry Community Health Center from 8:00 a.m. to 5:00 p.m., and Brown worked at the Isle of Capri casino from 11:00 p.m. to 7:00 a.m.  Brown took care of Le'Anthony while Myles was at work. Myles came home for lunch most days, as home was about a five-minute drive from work.

¶4.   On March 28, 2003, Myles left for work about 7:45 a.m.  Lester and Jureau had already left for school, so Le'Anthony and Brown were alone in the house.  Myles came home for lunch a little after noon, and she fed and played with Le'Anthony.  She left to go back to work around 1:25 p.m., and she had given Le'Anthony a bottle containing milk and cereal just before she left.  Myles got a phone call from Brown about ten minutes after she

---

[1]Jureau was nineteen and attended college, and Lester was seventeen and attended high school.

got back to work. Brown told her to come back home, that Le'Anthony had choked on some milk, was having trouble breathing, and they needed to take him to the emergency room.

¶5.    Myles immediately returned home, and she drove to the hospital while Brown held Le'Anthony. Upon arrival, Brown gave Le'Anthony to a nurse. Brown accompanied the nurse and Le'Anthony to an exam room, while Myles handled the necessary paperwork. The medical personnel tended to Le'Anthony over the next several hours, but his condition continued to deteriorate. His pediatrician ultimately decided that Le'Anthony needed to be flown by helicopter to Memphis. The Memphis crew could not come because of weather, so Le'Anthony's pediatrician called Jackson. According to the UMMC crew's records, the helicopter arrived in Clarksdale at 5:40 p.m. and departed at 6:37 p.m.

¶6.    Myles, Brown, and Jureau drove to Jackson. When they arrived, hospital personnel asked them to wait in an exam room. A doctor came in and told them that Le'Anthony had passed away on the flight to Jackson. They were allowed to see Le'Anthony's body and to hold him for awhile. They left the hospital around 2:00 a.m. and headed back to Clarksdale.

### *Investigation and Pretrial Proceedings*

¶7.    Dr. Steven Hayne performed an autopsy on Le'Anthony at the request of Coahama County Coroner Scotty Meredith. Dr. Hayne determined that the manner of death was homicide, and that the cause of death was "consistent with" Shaken Baby Syndrome. Coroner Meredith reported the results to the Clarksdale Police Department. Based on the autopsy results, the police began investigating "who the baby had been around during the timeframe that Dr. Hayne had told [them] . . . ."

3

¶8.    Brown and Myles went to church on March 30 and then went to eat lunch in Batesville. While they were at the restaurant, Lester called Myles to tell her that the police had come by the house and wanted to see her and Brown. They returned to Clarksdale and went to the police station, where they each gave separate statements. After Brown's statement, one of the officers told him that "[w]hat you're telling me is not matching to what happened to Le'Anthony . . . ." Brown was then arrested, and one of the officers testified at trial that the reason for the arrest was Dr. Hayne's report.

¶9.    Brown stayed in jail for two or three days before he was able to make his $75,000 bail (with help from family and friends). He was indicted for capital murder on December 2, 2003. The indictment charged Brown with "unlawfully, wilfully, feloniously and without the authority of law and with the deliberate design to affect [sic] death, kill[ing] and murder[ing] Le'[A]nthony Brown, a human being, while the said LeeVester Brown, was engaged in the commission of the crime of felonious abuse or battery of a child . . . ." Brown hired Johnnie Walls to represent him.

¶10.   On October 22, 2004, Brown filed a Motion to Hire Expert at the Expense of Coahoma County. Brown argued that:

> the sole primary basis [for his capital murder charge] is the finding and anticipated testimony of the Pathologist, Dr. Steven [Hayne], who performed a post mortem examination on his deceased child. The Defendant has no way of responding to such testimony or evidence presented by [the] Pathologist other than to hire a Pathologist of his choosing to evaluate the evidence and respond to the evidence presented by the State's Pathologist.

Brown explained that, while he had been able to retain his own counsel (again, with help from family and friends), he was "financially unable" to hire an expert to assist in his

4

defense. Brown attached an affidavit to his motion, swearing to his indigency, as well as information about the expert he intended to hire.

¶11. In its Response, the State argued that Brown was able to obtain bail, that he had retained his own counsel, and that he had "made his own choice as to where to pay his monies." The State also argued that an expert was not necessary to Brown's defense, and that his request was merely a "fishing expedition." The trial judge agreed with the State and denied Brown's motion, stating in his order that "[t]here is no authority to allow funds for expert assistance to a Defendant with retained counsel who has not been found to be indigent." (citing *Howell v. State*, 860 So. 2d 704, 720-23 (Miss. 2003)). Brown renewed his motion on the first morning of trial, but the trial judge again denied it.[2]

¶12. On November 4, 2004, the State filed a Motion to Amend the Indictment. The State requested that the trial court delete the words "with deliberate design" and add the words "with or without deliberate design." The trial judge granted the State's motion the same day.[3]

### *Trial*

¶13. Brown's trial began on August 7, 2006, and the State presented six witnesses in its

---

[2]Although the trial judge (who was not the same judge who had denied Brown's initial motion) denied Brown's renewed Motion, he did state that he "might would have given further consideration to it had it been raised before this juncture."

[3]There is no indication in the record that the trial judge held a hearing on the State's motion.

case-in-chief: Le'Anthony's pediatrician, Dr. Peggy Jo Wells; his mother, Shirley Myles; Flight Nurse William Bailey; Le'Anthony's half-sister, Jureau Myles; Officer Billy Baker; and Dr. Steven Hayne.

Dr. Wells

¶14. Dr. Wells testified that she became Le'Anthony's pediatrician following his stay at UMMC and Northwest Regional Medical Center in Clarksdale. Dr. Wells saw Le'Anthony approximately every two months, and he visited the office approximately every month for vaccinations. He had anemia of prematurity and some jaundice, but Le'Anthony had no other complications. Le'Anthony received a Synagis vaccination several times, with the last vaccination occurring two days before his death. The Synagis vaccination prevents a virus that affects the airways and causes babies not to breathe, especially premature babies. Dr. Wells testified that some potential side effects were redness at the injection site, vomiting, ear infections, wheezing, and asthma attacks, but that those were very rare.

¶15. Dr. Wells reported to the emergency room on March 28, 2003, after receiving a call that Le'Anthony had been brought in and was having difficulty breathing. Upon arrival, she observed that Le'Anthony was being ventilated, that he was alert, and that he was crying. She also observed "some fight – what we call fight in the baby. The kicking." Le'Anthony was extubated and then reintubated and was "posturing" – arching his back and head and extending his legs. Dr. Wells did a "nail bed" check, which showed that Le'Anthony was not "pumping out the blood and getting oxygen into the blood very well . . . ." Dr. Wells observed that Le'Anthony's breathing was very labored, and that his breath was very "raspy-sounding" when she listened to his chest. She testified that the "raspy sound" could come

6

from fluid, from infection, from blood, or from any secretions that had gotten into the lung fields.

¶16. Dr. Wells observed that the right side of Le'Anthony's face appeared "flat" – that it was not moving as well as the left side, and that his right eye was partially opened. According to Dr. Wells, the "flatness" evidenced possible nerve damage. She also testified that she could not correlate the "flatness" with the presentation of choking on formula. After the initial observation and treatment in the emergency room, Dr. Wells ordered a CT scan, which came back abnormal. Le'Anthony was then transferred to the ICU for care until he could be transferred to a children's hospital. While in the ICU, the doctors were never able to get Le'Anthony stabilized on a ventilator, and he began to bleed significantly through his endotracheal tube. Dr. Wells testified that Le'Anthony was "gravely ill." She did not have contact with the crew from UMMC after they picked up Le'Anthony, and she was no longer the physician of care after the transfer. Dr. Wells testified that a physician would not be able to detect Shaken Baby Syndrome immediately in all cases, and that a pathologist would be in the best position to diagnose it.

¶17. On cross-examination, defense counsel attempted to question Dr. Wells about studies that discuss immunization side effects which mimic Shaken Baby Syndrome. The State objected and argued that Dr. Wells had not been qualified as an expert in vaccinations and immunizations. The trial judge sustained the objection, and defense counsel was not able to question Dr. Wells regarding the studies.

¶18. Dr. Wells also testified on cross that she did not notice any bruises, abrasions, scars, or anything else abnormal when she examined Le'Anthony in the emergency room, and that

7

she had looked for them. She testified that she had never seen anything during her care of Le'Anthony to indicate any abuse, and that Brown had accompanied Myles on visits to her office. She "did not have any unrest or concerns or second thoughts regarding the care of Le'Anthony." She testified that Brown was initially hesitant when she told them that Le'Anthony would need a blood transfusion, but that he ultimately consented and then offered to give his blood. When they had to reintubate Le'Anthony, they had to hold his head and body down in order to do so, because he had "fight about him." Dr. Wells did not have any explanation for Le'Anthony's pulmonary or gastric bleeding.

¶19. On redirect, Dr. Wells testified that she did not see retinal hemorrhage during her examination of Le'Anthony. The medical personnel aspirated Le'Anthony's stomach and withdrew one hundred milliliters of formula. Dr. Wells testified that the nerve damage causing the "flatness" in the right side of Le'Anthony's face could have been caused by a brain hemorrhage or anything else that would cause pressure to that nerve.

Shirley Myles

¶20. On direct, Myles testified about her pregnancy and the events of March 28, 2003. Myles also testified that she and Brown had had a "dispute" when she came home for lunch that day. Specifically, she testified that:

> A. I asked [Brown] to hold Le'Anthony while I go and fix his bottle, and Le'Anthony started crying. So I took [Le'Anthony] from [Brown], and he told me that's the reason why he's so spoiled now. Every time he cry, y'all pick him up, and that was it.
> Q. And were any other words said about that?
> A. No [sir].
> . . .
> Q. Shirley, when you left work, after lunch, you said y'all had an argument?
> A. Yes, sir.

8

. . .
Q. Was there still some bitterness between y'all –
A. Yes, sir.
Q. – when you left?  So he was still angry?
A. (No audible response).
Q. He was still angry when you left?
A. Yes, sir.

¶21.    On cross, Myles testified that she and Brown had dated about two years before they were married.  They went a lot of places together.  She described their marital problems as "the problems that most married couples have" – just disagreements, but no fighting or violent disagreements about anything.  Myles testified that Brown was a good man, that he provided for her, that he was respectful to her, and that he never abused her.[4]  She and Brown planned to have Le'Anthony, and Brown accompanied her to some of her prenatal visits.  Brown supported her during her pregnancy, and he was excited about the baby, because Le'Anthony was his first child.  Brown got along with Jureau and Lester as well.

¶22.    When the doctors decided Myles needed to go to Jackson to be induced, she went by ambulance, and Brown followed in the car.  Brown was in the delivery room holding her hand when Le'Anthony was born, and he did not leave during Myles's stay at the hospital in Jackson.  Brown would visit with Myles for awhile in her room, and then he would go visit Le'Anthony in the nursery for awhile.  After Myles was released from the hospital and came home, she and Brown would drive down from Clarksdale to see Le'Anthony.  When Le'Anthony was transferred to the hospital in Clarksdale, she and Brown went to see him and were able to hold him.

---

[4]Myles did testify later during the State's rebuttal that Brown had "verbally" abused her.

9

¶23. Brown helped Myles with Le'Anthony after they brought him home from the hospital. Brown changed Le'Anthony's diapers, prepared his formula and fed and bathed him. Myles had no complaints about the way Brown did any of those things. Myles testified that Brown appeared to love Le'Anthony, and that he bought Le'Anthony many things, such as clothes, receiving blankets, etc. Brown never acted as though he resented Le'Anthony.

¶24. In December of 2002,[5] Myles left Le'Anthony with her son Lester while she went to Walmart. Myles had left Le'Anthony in his carrier on the bed with Lester, and when she returned from Walmart, Le'Anthony was on the floor. She did not take him to the doctor because she did not think anything was wrong with him.

¶25. After Myles went back to work, Brown would be at home during the day to keep Le'Anthony, because he worked the graveyard shift. He did this for a couple of months before Le'Anthony passed away. Myles never saw any scars or bruises or other evidence that Brown was abusing Le'Anthony. She never saw Brown get rough with Le'Anthony. They would take turns getting up to feed Le'Anthony during the night.

¶26. Myles reiterated that she and Brown had had a "disagreement" at lunch the day Le'Anthony died. She said that Brown's comment about picking Le'Anthony up too much was all that was said, but that she "took it as an argument." When Brown called her to tell her they needed to take Le'Anthony to the hospital, she wondered why he didn't just take Le'Anthony himself, because they had two cars. Despite testifying on direct that Brown had

---

[5]Brown testified that the fall incident happened in February 2003, while Myles testified that it happened in December 2002.

met her at the door with Le'Anthony, she testified on cross that Le'Anthony was inside the house and Brown went and got him.

¶27. Myles did not see any blood on Le'Anthony until after he had been transferred to the ICU. She did not think that the hospital personnel handled Le'Anthony roughly. She and Brown both were concerned when they were told that Le'Anthony needed a blood transfusion, and Brown asked Dr. Wells if the hospital personnel had done something to Le'Anthony. When they got to the hospital in Jackson, they were told that Le'Anthony had passed away on the flight. Myles thought Brown went into the room where Le'Anthony's body was first, and then he came back and got her. Myles was crying, but she could not recall if Brown was crying or not.

¶28. Myles decided to divorce Brown after she "found out what happened" to Le'Anthony, but they lived together for awhile after his death. Myles also testified, though, that she did not see any evidence that Brown had done anything to Le'Anthony. Brown did not threaten her or try to fight with her, but she did call the police once when he refused to leave the house. Myles had a life insurance policy on Le'Anthony through her employer, and she collected on it after Le'Anthony's death.

¶29. When Myles gave her statement to the Clarksdale police, Brown was not in the room, and she did not say anything about Brown doing something to Le'Anthony. She did not help bail Brown out of jail, but she did accompany him to Greenville when he went to talk with his defense lawyer. Myles could not recall whether she told the people in the attorney's office that she did not believe that Brown had done anything to Le'Anthony. On redirect,

11

Myles testified that she stopped having feelings for Brown after she found out what had happened to Le'Anthony. She moved out in June 2003, and they divorced in 2004.

William Bailey

¶30. William Bailey was a helicopter nurse on Le'Anthony's flight to Jackson. Bailey knew that a six-month-old child was in respiratory distress, had been intubated, and was in "dire distress." Le'Anthony was alive when they took off from Clarksdale, but he went into cardiac arrest approximately one minute after they lifted off. The crew gave Le'Anthony some cardiac drugs, without response. They continued their efforts for approximately thirty minutes. They radioed their physician in the UMMC pediatric ER and told her what was going on, and she elected to terminate their efforts at that time. Le'Anthony had no vital signs when they elected to cease their resuscitation efforts. Prior to Le'Anthony's death, Bailey observed a "pink frothy fluid" filling up his ET tube that had blood mixed with it. Bailey did not recall seeing any physical injuries.

¶31. On cross, Bailey testified that it was possible for people to be injured when they are being intubated, and that he had seen that before. He said that the bleeding could come from multiple places, such as when a patient is not circulating the blood properly, and it mixes with the "frothy sputum" and comes back up through the trachea. Bailey had seen this sort of bleeding a number of times.

¶32. On redirect, Bailey testified that, when they initially checked Le'Anthony, there were no breath sounds, which "could in turn mean that the ET tube was improperly placed." They pulled the tube out and put another one in, and then they heard breath sounds.

Jureau Myles

12

¶33. Jureau is Myles's daughter from a previous marriage, and she lived with her brother Lester, Myles, Brown, and Le'Anthony. She said Le'Anthony was a good baby, and she helped take care of him. No harm was done to Le'Anthony, but Brown would "holler at the baby a lot" because he was crying. Jureau would buy necessities for Le'Anthony sometimes when Brown "didn't do his job." Brown did not pay bills, and sometimes he would complain when Myles would ask him to buy diapers and medicine.

¶34. On cross, Jureau testified that she did not like Brown. She did not like the way he treated her mother. Brown did not do the things a husband should do in a household – he did not help pay the rent or the utility bills, and she thought Myles paid his car note. She did not tell Myles that Brown yelled at Le'Anthony, because she said Myles knew. She said that Brown "probably helped some [with Le'Anthony], but he didn't help like he should've." Brown did not want Jureau to be around Le'Anthony because he was jealous. Brown would tell her that Le'Anthony was "all right" when he was crying, and he told Myles that Jureau should stop picking him up so much when he was crying. Le'Anthony fell from the bed onto the floor one time when Lester was watching him, but nothing was wrong with him.

¶35. Late one night after Le'Anthony's death, Myles called Jureau from a neighbor's house and told her that Brown was "assaulting her." Jureau called the police, and when she arrived at the house, she noticed that Brown had torn the phone jack out of the wall.

¶36. Jureau testified that she was "not saying that Brown did not take care [of] or care for [Le'Anthony]," but she did remember him yelling at Le'Anthony, and she remembered him "spanking" Le'Anthony once or twice because he was crying. She remembered Brown

13

buying diapers on occasion, but she did not remember him buying clothes or toys or other things for Le'Anthony.

<u>Billy Baker</u>

¶37.    Billy Baker was a detective with the Clarksdale Police Department who investigated Le'Anthony's case. He did not go to the scene on March 28, 2003, but he was called on a later date by Coroner Scotty Meredith and the state medical examiner. Based on those phone calls, they began an investigation into Le'Anthony's death. They interviewed Brown on the evening of March 30, 2003. Brown stated that he walked Le'Anthony around for awhile after Myles went back to work until he stopped crying. He laid Le'Anthony on the couch, propped a bottle for him, and then went into the kitchen for a glass of water. Brown heard Le'Anthony cough, and when he went back in to check on him, he saw milk coming from Le'Anthony's mouth and nose. He picked up Le'Anthony, but Le'Anthony would not move or respond. He called Myles to come and get them and take them to the hospital. Later in the interview, Brown said that the hospital personnel in Clarksdale must have done something with the tube to make him hemorrhage.

¶38.    At the time the Clarksdale police talked with Brown, they had a copy of Dr. Hayne's provisional autopsy report, and they had spoken with Dr. Hayne also. That was the basis for Brown's arrest.

¶39.    On cross, Baker testified that Brown agreed to talk with them and that he answered their questions. Baker did not hear Brown say that he was blaming the doctors in Clarksdale, but that he just said that there was hemorrhage, and he wondered if that could have caused Le'Anthony's death.

14

¶40. On redirect, Baker testified that Brown said he had asked the doctors if the tube could have punctured Le'Anthony's lung, and the doctors told him no, that could not have happened. Brown said Dr. Wells had told him that they were trying to unclog milk from Le'Anthony's lungs.

Dr. Steven Hayne

¶41. Dr. Hayne was tendered as an expert in the fields of anatomical, clinical, and forensic pathology with no voir dire or objection from Brown. Dr. Hayne performed an autopsy on Le'Anthony at the request of Coahoma County Coroner Scotty Meredith. During the external examination, Dr. Hayne noticed evidence of "medical intervention" – that the medical personnel had attempted to place intravenous lines and to draw blood from Le'Anthony. The other "significant finding" during the external examination was the "presence of incomplete periocular hematomas" – small bruises located on the inner rings of the eyes.

¶42. There was "no extensive [trauma] on the external surface . . . no significant bruises outside of those small areas around the right and left eyes . . . no tears to the skin . . . [n]o cuts, scrapes, no scratches or other types of injuries on the external surface of the decedent." This indicated that there was no significant external trauma, "such as striking a child with an object or throwing a child against a hard surface."

¶43. After the external examination, Dr. Hayne opened Le'Anthony's body to look at his organs, including "the contents of [his] head." Nothing of significance was noted in the other organs, except for the pooling of blood, which is expected after death. There were no injuries to Le'Anthony's scalp, and his skull was not fractured, but there was extensive

15

bleeding around the surface of the brain – a volume of 120 ccs, which was a "large volume," equivalent to a third of a cup of blood. The blood was partially clotted. There was also a shift of the brain from right to left, pushing the brain to the left and down. There was swelling of the brain, and there was a hemorrhage about the optic nerves. There was no direct injury – tears or bruising – to the brain itself. But the "predominate injuries" were the:

> subdural hemorrhage, the collection of blood between the inner surface of the skull and the outer surface of the brain, and also cerebral edema, swelling of the brain and shifting of the brain to the left, pushing down on the brain, and eventually that would cause compression of the brain stem, the lowest part of the brain that goes into the vertebral column that becomes part of the spinal cord. When that occurs, the basic functions of life, respiration, heart rate, maintenance of core body temperature and the like will no longer function and death will result.

¶44. Dr. Hayne testified that in a "pure Shaken Baby Syndrome, a clinical physician can conduct an ophthalmological examination, examination of an eye, with a special instrument that most physicians have and produce a light flow into the eye, and one can grossly see the areas of hemorrhage on the retina, the inner structure of the eye itself." When asked by the State if one can see Shaken Baby Syndrome externally, Dr. Hayne responded:

> Sometimes it's difficult, counselor. If one does not have an indirect way to observe the second salient component of Shaken Baby Syndrome, that is, the subdural hemorrhage, then one could only estimate that that could have occurred. The presence of retinal hemorrhage in a small child, in the right clinical setting, is a supportive indication of a Shaken Baby Syndrome. If they conduct a CT scan or an MRI scan or do a spinal tap, and they see evidence of blood in the subdural space with the retinal hemorrhage, then it becomes highly probable that Shaken Baby Syndrome has occurred.

¶45. The State introduced into evidence several photographs taken during Le'Anthony's postmortem investigation, and Dr. Hayne testified as to what each photograph represented. Dr. Hayne noted that there was a "purging of serosanguineous, bloody fluid" coming out of

16

Le'Anthony's nose, and that that would be consistent with the "pink, frothy" liquid that the flight nurse had described. Dr. Hayne stated that this pink, frothy material was commonly found in children after death, and that he did not think it was caused by the medical intervention in this case, because he had examined Le'Anthony's airways and had found no injury.

¶46. Dr. Hayne stated that he thought the retinal hemorrhage was "subcutaneous tissue bleeding underneath the skin . . . as a direct result of the shaking of the child." When asked by the State if he had been able to determine the cause of death, Dr. Hayne testified:

> A. I called it consistent with Shaken Baby Syndrome, and specifically there was bilateral retinal hemorrhages in the eyes. There was subdural hemorrhage between the skull and the brain. There was subarachnoid hemorrhage, multi-focal at different locations on the surface of the brain. There was a significant left midline shift of the brain, and there was brainstem herniation, that the brain was pushed down on the telencephalon that controls the primitive structures – the functions of life: Heart rate, respiration, core body temperature, and the like, counselor.
>
> . . .
> Q. And that the immediate cause of death was Shaken Baby Syndrome –
>
> A. Yes –
> . . .
> Q. What was the immediate cause of death?
>
> A. I said it was consistent with Shaken Baby Syndrome, sir.
>
> Q. And will you tell us what that is?
>
> A. That is a vigorous shaking of a child, producing oscillation of the brain inside the skull, and it tears the small blood vessels that go from the inside of the skull to the brain, and they start bleeding. There's a collection of blood. Cerebral edema develops. Eventually death will ensue.
>
> Q. Okay. Can this happen with a child by himself shaking his head?

17

A. No, counselor. This takes a vigorous shaking of the baby. You see a similar type injury in restrained children in motor vehicle crashes, a similar type of force being applied to the head.

. . .

A. It would take the violent shaking of a child to produce these types of injuries. Granted, a child's head in relationship to its body is different than an adult. The weight of the child's head is proportionately larger than you see in an adult, and also the neck muscles in a child are far less developed than you see in an adult. But even with that, it still takes a substantial amount of force, shaking a child to produce these injuries.

. . .

Q. How long would it take for this child to have been bleeding within the head before demise?

A. It could be a considerable period of time because there would be – most importantly there would be an alteration in this child's orientation, behavior, feeding, even consciousness, and that came out of a study at Harvard and Mass General that they conducted, and they found in the overwhelming number of cases when they had Shaken Baby Syndrome or pseudo-Shaken Baby Syndrome secondary to a motor vehicle crash and the like, there was an immediate change in that child.

¶47. Dr. Hayne testified that Dr. Wells's observation of Le'Anthony's "flat" face indicated that severe injury already had occurred, and that some of the nerve structures no longer were functioning normally. Dr. Hayne opined that the manner of death was homicide. He thought that the injuries he observed were inconsistent with a child having fallen off a bed.

¶48. On cross, Dr. Hayne testified that he could not say that Le'Anthony definitely died from Shaken Baby Syndrome, but that he had a "very high degree of confidence" that was the case. He had not seen Le'Anthony before the autopsy, and he did not have any of his medical records – he knew only what the coroner had told him about Le'Anthony being brought to the hospital. He did not have any knowledge of who had been around Le'Anthony and when. Dr. Hayne did not think the pink, frothy liquid coming from Le'Anthony's mouth was a result of intubation, because he did not see any injuries to

18

Le'Anthony's airways during his examination. When asked by Brown's counsel whether some immunizations can cause symptoms of Shaken Baby Syndrome, Dr. Hayne opined that the "classic problem vaccination" was the first-phase DTP shot, but that he did not think that was at issue in Le'Anthony's case.

¶49. On redirect, Dr. Hayne reiterated that one would conclude that Shaken Baby Syndrome had occurred from the "constellation of findings." He did state, however, that he would have had a different opinion if he had had evidence of a car crash, but that he had no evidence of that.

¶50. The State rested following Dr. Hayne's testimony. The next morning, Brown requested a directed verdict in chambers, which the trial judge denied.

¶51. Brown testified in his own defense, and he presented three character witnesses as well: Betty Hardmon, a former supervisor; Steve Burnette, a friend and distant relative; and Clinton Powell, his hometown pastor. Hardmon testified that Brown was one of her "heavy duty" men at the Isle of Capri. She testified that Brown was a "very peaceful man," had never been in trouble that she knew of, and was "just a very nice young man." Burnette testified that Brown had a good reputation for peacefulness and a good reputation for truthfulness. Powell reiterated Brown's reputation for peacefulness and truthfulness. Powell also testified that Brown acted like a loving father should act, and that he acted as though he really cared about Le'Anthony.

¶52. Brown testified that he had one conviction for driving under the influence, but no other criminal history. Le'Anthony was his only child. Myles had suffered a miscarriage about a year before Le'Anthony was born. When they learned about the first pregnancy,

19

Brown "was the happiest person that ever was," because that would have been his first child. Brown had been married one time before, and his first wife had had a miscarriage as well. He wanted children.

¶53. Brown got along well with Lester and Jureau. They would go out to eat and go to church together – he considered Myles and the children and himself a family. He never had to discipline Lester or Jureau, and they would do what he asked. He was surprised at Jureau's testimony about him, because they "used to get along." He paid bills – he and Myles "went half and half on bills." Myles did not have any objections to the way he took care of her and her children.

¶54. When they found out Myles was pregnant with Le'Anthony, Brown was happy because "God gave [him] a second chance to . . . have another child born." Brown accompanied Myles on all her visits to the Women's Clinic for her prenatal care. Myles had high blood pressure, and the doctors told them that Le'Anthony would probably be born prematurely. Myles ultimately was rushed to Jackson via ambulance, and Brown followed in the car. He was in the delivery room holding Myles's hand when Le'Anthony was born. He was happy, but he was also worried about Le'Anthony and Myles because of their complications. He wanted to cut the umbilical cord, but the doctors had to rush Le'Anthony out of the room because he was having trouble breathing. After Le'Anthony was born, Brown would go back and forth between the nursery – where Le'Anthony was in an incubator – and Myles's room to check on both of them. He was able to hold Le'Anthony one time for about fifteen minutes, and it was a "good feeling."

¶55.   Le'Anthony had to stay in the hospital for awhile after Myles was released, because he had not gained enough weight.  Le'Anthony was transferred to the Clarksdale hospital for a few days, and then Brown and Myles brought him home.  Brown "felt great about [Le'Anthony] coming home because he had made it through all of this crisis and everything that he was going through, and I [thought] it was time for him to come home."  Brown further testified that he "was happy.  I was very much in love with my child.  I wanted – I just wanted him to be at home where I could love him like I wanted to love him . . . like a father should."

¶56.   He and Myles had a nice relationship – they did not have any problems, arguments or fights.  They would go out and shop for Le'Anthony together.  Brown took over care of Le'Anthony when Myles left for work – he would change his diapers, prepare and feed him his bottles, and bathe him.  He learned how to do all of those things by taking care of his nieces and nephews.  He knew that Le'Anthony was premature, so he handled him "safely."  He never dropped Le'Anthony or did anything else to him that would injure him.  Brown and Myles took Le'Anthony to church in Clarksdale, and sometimes in Dublin, where Brown was from.  Brown, Myles, and Le'Anthony would all be dressed alike for church.

¶57.   Brown could  recall only one accident involving Le'Anthony.[6]  Lester was keeping Le'Anthony while Brown, Myles, and Jureau went to Walmart.  When they got back, Jureau walked into Lester's room and found Le'Anthony lying on the floor.  He had fallen from Lester's bed onto the floor beside Lester's weights.  There were some dried "tear spots" in

---

[6]Again, Brown testified that the fall incident happened in February 2003, while Myles testified that it happened in December 2002.

the corner of Le'Anthony's eyes, and his car seat was on top of him. Brown told Myles they were going to take Le'Anthony to the ER, but Myles said there was nothing wrong with him. There was also one time when Jureau was feeding Le'Anthony; he began to cough, and Jureau said Le'Anthony had "strangled on some milk."

¶58. Brown never spanked Le'Anthony – he testified that he "never laid a hand on him." He did not know why Jureau had said that he had spanked Le'Anthony and yelled at him. Brown stated that he was not frustrated by Le'Anthony's crying, because "[a]ll babies gonna cry. Even grown people cry. So why am I gonna get frustrated with him because he's crying?" Brown never got frustrated about keeping Le'Anthony: "I loved keeping my baby. I didn't regret none of the moments that I spent with him. There was no regrets at all."

¶59. Brown denied harming Le'Anthony several times during his testimony, with statements similar to the following:

> Q. You know you're charged with shaking the baby?
>
> A. Yes, I know, but I know one thing. I don't know what happened. I know I didn't do nothing to him. I didn't harm him in no kind of way – no kind of way at all. When they come up with this shaken, I don't know. The only thing I know, I did not harm him.
> . . .
> Q. All right. Were you – had you – were you afraid because you had done something?
>
> A. No. I wasn't afraid because I know I didn't do anything. I was afraid because he was sick, and I didn't know what was wrong with him.

¶60. When they found out Le'Anthony had passed away, Brown said that he felt "really bad" – that besides his mother dying, Le'Anthony's death "[hurt] him the most." He told the hospital staff that it "wasn't true," that "my baby was somewhere around that hospital," and

22

he wanted to know where he was. Hospital personnel let Brown go into the room with Le'Anthony's body first, and he picked Le'Anthony up and held him. Myles came in later and held him for awhile. Some doctors came in and "started checking [Le'Anthony's] eyes and everything." After they held Le'Anthony awhile, they left and went back to Clarksdale.

¶61. Brown and Myles went to church on March 30. Brown was sad because people kept coming up and talking to them, and Le'Anthony was not there. After church, they decided to go to Batesville to eat, because they "needed a moment to [themselves] away from everybody." Lester called and said that the police had come by the house and needed to see them. So they left Batesville immediately and headed back to Clarksdale. The police took his and Myles's statements separately. Brown agreed to talk to the police: "I freely talked to them because I didn't have nothing to hide because I know I didn't do anything to hurt my baby."

¶62. After his statement, one of the officers told Brown that they had a problem – that what Brown was telling them did not "match up" to what happened to Le'Anthony. Brown said that he did not care what the detectives said, he did not harm Le'Anthony. The police handcuffed Brown at that point and took him to jail. Brown was in jail two or three days before his family was able to raise money to post bail, and he was in jail during Le'Anthony's funeral. He wanted to go to the funeral, but no one told him that they were about to have it.

¶63. Things were different between Brown and Myles after he got out of jail. He tried to get Myles to talk about the situation, but she "kept her distance." Although they eventually separated, he did not want to – his feelings were still the same towards Myles. One night he

23

tried to talk to Myles, and she got mad and ran out the door. She went to the neighbors and called Jureau, who then called the police. The police came and Myles said she wanted Brown to leave, which he did.

¶64. On cross, Brown testified that he did not know how the damage described by Dr. Hayne was done to Le'Anthony, but that he did not do it. He said that when he got to the hospital, that the doctors told him that they were trying to "unclog the milk from Le'Anthony's lungs." He thought they should have taken Le'Anthony to the ER after the fall from the bed, but Myles did not want to. He felt that the Clarksdale hospital personnel damaged Le'Anthony during their treatment of him. He said that he did not have any objection to Jureau or Myles holding Le'Anthony. On the day Le'Anthony died, Brown's car was broken and at his father's house, so they had only one working car at the time. He used to go out to the clubs on the weekends, but he stopped after Le'Anthony was born because he wanted to spend time with him.

¶65. After the defense rested, the State recalled Myles for a brief rebuttal. Myles testified that she did not have a problem with all the people stopping by after Le'Anthony's death. It was Brown's idea to go to Batesville for lunch on March 30, because he wanted to get away from everybody. Myles was sure that Brown's car was running the day that Le'Anthony died. On the night she called Jureau, Brown had "snatched the phones out of the wall" to keep her from calling the police. Myles did not know anything about the family ever dressing alike for church – she said they did not dress the same.

¶66. When they were told by hospital personnel that Le'Anthony had died, Brown left the room. A social worker brought Le'Anthony's body to Myles, and she held him for awhile.

Brown came back into the room a while later and just stood in the corner – he never picked up Le'Anthony. Myles did not see Brown cry or grieve over Le'Anthony. On the night she called Jureau, Brown was not being violent, but he was being "verbal" towards her – calling her "all kind of bitches and whores," trying to get her to talk to him. Brown would not leave the house after the police got there, so she left.

¶67. The State finally rested after Myles's rebuttal testimony. After deliberating for a little while, the jury sent a note to the judge, asking "[i]s our only option capital murder?" After discussion between the parties and the trial judge, the judge sent a note back to the jury, stating: "The answer is that you have the options for reaching a verdict are [sic]: (1) "We the jury find the defendant guilty of capital murder," or "We the jury find the defendant not guilty." After further deliberation, the jury found Brown guilty of capital murder.

¶68. The parties then entered the penalty phase, and the jury sentenced Brown to life in prison without the possibility of parole. Brown filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, a New Trial, which the trial judge denied. Brown now appeals to this Court[7] and argues seven points of error:

(1) The trial court erred when it amended the indictment;
(2) The opinion of death by shaking is medically and legally invalid;
(3) The trial court erred when it refused funds for Brown to obtain an expert;
(4) The trial court erroneously restricted Brown's cross-examination;
(5) The conviction was contrary to the sufficiency of the evidence and the weight of the evidence;
(6) Brown's trial counsel was ineffective; and

---

[7]Despite Brown's trial concluding in 2006, this is his direct appeal. The delay resulted from a combination of his trial counsel not filing an appeal and the death of the trial court reporter. Brown sought and obtained permission to proceed out-of-time in this appeal.

25

(7) The trial court erred when it refused proposed jury instruction D-5C.

¶69. We reorder these points of error for purposes of this opinion.

## I. The trial court did not err when it amended the indictment.

¶70. As discussed above, the initial indictment charged Brown with "unlawfully, wilfully, feloniously and without the authority of law and *with the deliberate design to affect* [sic] *death*, kill[ing] and murder[ing] Le'Anthony Brown . . . ." (Emphasis added.) The State subsequently moved to have the indictment amended to delete the words "with deliberate design" and add the words "with or without deliberate design." The trial judge granted the State's motion the same day it was filed.

¶71. Brown argues that this amendment was substantive, in that it "altered a defense and that the trial court was without authority to change the grand jury's original charge." Brown argues further that the amendment was prejudicial to his defense of "lack of intent or lack of premeditation," and that, after the amendment, that defense was "rendered meaningless." We disagree.

¶72. First, there is no evidence in the record that Brown objected to the amendment[8] or moved to quash the amended indictment, and he admits as much in his brief.[9] He urges this Court to recognize the amendment as plain error, but we find that no error occurred, as explained below. Thus, Brown cannot even pass the first prong of the plain-error analysis. ***Keithley v. State***, 111 So. 3d 1202, 1204 (Miss. 2013) (citation omitted).

---

[8]There is no indication in the record that the trial judge held a hearing on the motion.

[9]Brown did move to quash the indictment, but that motion was prior to the State's motion to amend and Brown did not argue anything about the "deliberate design" language.

¶73.     "'It is fundamental that courts may amend indictments only to correct defects of form, however, defects of substance must be corrected by the grand jury.'" ***Spears v. State***, 942 So. 2d 772, 774 (Miss. 2006) (citations omitted). "'It is well settled . . . that a change in the indictment is permissible if it does not *materially alter facts which are the essence of the offense* on the face of the indictment as it originally stood or *materially alter a defense to the indictment as it originally stood* so as to prejudice the defendant's case.'" ***Id.*** (citation omitted) (emphasis added).

¶74.     Here, as the State points out, Brown *never had* the option to argue lack of intent or premeditation under the clear language of the capital-murder statute:

> . . .
>
> The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
>> (f) When done *with or without any design to effect death*, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony; . . . .

Miss. Code Ann. § 97-3-19(2)(f) (Rev. 2014) (emphasis added). So it cannot be said that the amendment materially altered a defense to the indictment as it originally stood, as lack of intent is never a defense to felony murder.

¶75.     Moreover, this Court specifically has stated that "[f]elony murder may be charged as 'malice aforethought,' 'premeditated design,' or 'deliberate design' murder in the indictment." ***Duplantis v. State***, 708 So. 2d 1327, 1343-44 (Miss. 1998). And finally, "mere surplusage" usually may be struck from an indictment without any prejudice to the defendant. ***Lee v. State***, 944 So. 2d 35, 39-40 (Miss. 2006). We find that the phrase "with

the deliberate design" in this indictment is such surplusage. *See Lee*, 944 So. 2d at 39-40 ("Additionally, and more on point with the present case, the defendant in *Simmons v. State*, 109 Miss. 605, 614, 68 So. 913, 914 (1915), was indicted for statutory rape. This Court held that the language 'without her consent' in the indictment was mere surplusage that could properly be removed without prejudicing the defendant. *Id.* at 915.").

¶76. We are unpersuaded by Brown's reliance on *Wolfe v. State*, 743 So. 2d 380, 383-85 (Miss. 1999), *Quick v. State*, 569 So. 2d 1197, 1199-1200 (Miss. 1990), and *Richmond v. State*, 751 So. 2d 1038, 1042-47 (Miss. 1999). A close reading of those cases reveals that this Court's decisions in *Wolfe* and *Quick* turned on the lack of proper notice to the defendant in the indictment of the crime he was charged with, or on submission to the jury of a crime that the defendant had not been indicted for.

¶77. And *Richmond* is simply inapplicable here. In fact, this Court clarified *Richmond* in *Lee v. State*, 944 So. 2d 35 (Miss. 2006), and stated: "[i]n *Richmond*, this Court was not presented (as we are today) with the question of whether an amendment to the indictment by removal of surplusage was appropriate. Thus, in [ . . . ] *Richmond* this Court had no need to address or discuss our precedent which analyzes the removal of surplusage and sets forth the test therefor. *Accordingly, Richmond does not serve as precedent for the issue of whether a motion to amend an indictment should be granted or denied.*" *Id.* at 39 (emphasis added).

¶78. Here, there is no such notice problem or inappropriate submission to the jury, and Brown does not argue that – he argues only that he was deprived of a defense he otherwise would have had. This issue is without merit.

28

**II.     The validity of the Shaken-Baby-Syndrome theory is not properly before this Court.**

¶79.    Brown devotes a large portion of his brief to arguing that the "so-called Shaken Baby Syndrome" is no longer medically and/or legally valid.  Brown cites numerous experts, studies, and articles to support his assertion that "[c]urrent medical science has now generally rejected the former thought that the only cause of so-called SBS symptoms, occurring without any other trauma, is homicide."

¶80.    But the problem is that none of this authority is in the record.[10]  And it is well-settled that this Court can consider only evidence that is in the record:

> We have on many occasions held that we must decide each case by the facts shown in the record, not assertions in the brief, however sincere counsel may be in those assertions. Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them.

*Mason v. State*, 440 So. 2d 318, 319 (Miss. 1983).  *See also Tanner v. State*, 764 So. 2d 385, 402 (Miss. 2000) ("'[t]his Court will not consider matters which do not appear in the record and must confine itself to what actually does appear in the record.'") (citation omitted).

¶81.    Additionally, Brown did not raise the validity of the Shaken-Baby-Syndrome theory before the trial court, which likewise bars this Court from reviewing it.  *See King v. State*, 857 So. 2d 702, 717 (Miss. 2003).   So, while this argument might be appropriate to pursue

_____

[10]In fact, the State filed a Motion to Strike Appendix A (Dr. Hayne's autopsy report) and Appendix B (a list of "additional" authorities on Shaken-Baby Syndrome), which were attached to Brown's initial brief.  Justice Lamar granted the State's Motion on June 6, 2014.

in a post-conviction action, this Court cannot review the validity of the Shaken-Baby-Syndrome theory at this juncture.[11]

### III. Brown's conviction was supported by sufficient evidence and was not against the overwhelming weight of the evidence.

*Sufficiency of the Evidence*

¶82.    "[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (citations omitted). "However, this inquiry *does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'* Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" ***Id.*** (citations omitted) (emphasis added). "[I]f a review of the evidence reveals that it is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial

---

[11]We are not persuaded, though, by the State's argument that Brown somehow has waived the right to challenge the Shaken-Baby-Syndrome theory.  The State argues that, because Brown did not bring this argument before the trial court, he is procedurally barred from bringing it before this Court.  While it is true that defense counsel did not voir dire Dr. Hayne or challenge his qualifications as an expert, Brown is not claiming that Dr. Hayne was unqualified.  Rather, he is arguing that the Shaken-Baby-Syndrome theory is invalid, and he argues he simply had no way to challenge that theory without his own expert.

30

judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." ***Id.*** (citations omitted).

¶83. "When the State's case is based entirely upon circumstantial evidence the State is required to prove the defendant guilty not only beyond a reasonable doubt but to the exclusion of every reasonable hypothesis consistent with innocence." ***Montgomery v. State***, 515 So. 2d 845, 848 (Miss. 1987) (citations omitted). "Circumstantial evidence need not exclude every 'possible doubt' but only every other 'reasonable' hypothesis of [innocence]." ***Id.*** Recently, in ***Cotton v. State***, ___ So. 3d ___, 2014 WL 2772919 (June 19, 2014), this Court stated that "[a] hypothesis must be based on evidence and the reasonable inferences that can be drawn from the evidence. A hypothesis is '[a] supposition based on evidence but not proven; a proposed explanation, supported by evidence, that serves as a starting point for investigation.'" ***Id.*** at *3 (citation omitted) (emphasis added).

¶84. Here, Brown was charged with capital murder for killing Le'Anthony in the commission of felonious abuse or battery of a child, as set forth in Section 97-5-39(2) of the Mississippi Code, which, at the time of Brown's indictment and conviction, read: "(2) Any person who shall intentionally (a) burn any child, (b) torture any child or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child . . . ."

¶85. We find that, from this record, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." It is undisputed that Brown was alone with Le'Anthony when Le'Anthony began exhibiting distress. Jureau testified that Brown

"hollered" at Le'Anthony and had "spanked" him once or twice. Myles and Jureau testified that Brown did not like them to pick up Le'Anthony every time he cried. And Myles testified that she and Brown had had a disagreement about Le'Anthony and that Brown was angry when she left to go back to work the day Le'Anthony died. It is the jury's job to judge the credibility of these witnesses. *Watkins ex rel. Watkins v. Mississippi Dep't of Human Servs.*, 132 So. 3d 1037, 1044 (Miss. 2014).

¶86.    Dr. Hayne testified that Le'Anthony's death was "consistent with" Shaken Baby Syndrome, that he had a "high degree of confidence" in that diagnosis, and that he had "no other explanation" for Le'Anthony's death. He testified that it would require the "violent shaking of a child" to cause Le'Anthony's injuries. He also testified that, in his opinion, neither the fall from the bed nor the immunizations caused Le'Anthony's death. In sum, we conclude that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Weight of the Evidence*

¶87.    This Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would *sanction an unconscionable injustice*." *Bush*, 895 So. 2d at 844 (emphasis added). The evidence must be viewed in the light most favorable to the verdict, and the evidence must preponderate heavily against the verdict. *Cotton*, 2014 WL 2772919, at *5.

¶88.    For the reasons stated in the sufficiency-of-the-evidence analysis, we do not find that Brown's conviction was an "unconscionable injustice."

32

**IV.    The trial court erred when it denied Brown's request for an expert.**

¶89.    As detailed in the facts, Brown filed a Motion to Hire an Expert at the Expense of Coahama County.  He attached an affidavit to his motion, in which he swore that he was without sufficient funds to hire an expert.  He also attached to his motion information about the expert he intended to hire.  The State responded and argued that Brown had been able to post his own bond, had retained his own counsel and had "made his own choices as to where to pay his monies."  The trial court agreed with the State and denied Brown's motion, stating in his Order that: "There is no authority to allow funds for expert assistance to a Defendant with retained counsel who has not been found to be indigent."[12]

*A.  Need For Expert*

¶90.    In **Ake v. Oklahoma**, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), the United States Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, *see* **Ross v. Moffitt**, 417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," *id.* at 612, 94 S. Ct., at 2444. To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," **Britt v. North Carolina**, 404 U.S. 226, 227, 92 S. Ct. 431, 433, 30 L. Ed. 2d 400 (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them.

---

[12]There is no indication in the record that the trial judge held a hearing on Brown's motion.

33

*Ake*, 470 U.S. at 77. This Court has stated that "a defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial. *The relative importance of the testimony offered by the State's experts is one factor to consider in assessing the fairness of the trial.*" *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994) (citations omitted) (emphasis added).

¶91.   "The United States Supreme Court 'has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.'" *Lowe v. State*, 127 So. 3d 181 (Miss. 2013) (citation omitted). "We have echoed this principle, holding that a trial court must provide expert assistance to an indigent defendant when denial of such assistance would render the trial fundamentally unfair." *Id.*

¶92.   Brown argued in his motion that "the sole primary basis for [his capital murder charge] is the finding and anticipated testimony of the Pathologist, Dr. Steven [Hayne]." After carefully reviewing the trial transcript, we agree. We find that Brown was denied the "raw materials integral to the building of an effective defense," as he had absolutely no way to counter the State's sole evidence of the cause of death, or even to determine the proper questions to ask to challenge Dr. Hayne on cross.[13]

---

[13]A portion from this Court's recent opinion in *Lowe v. State* is instructive on this last point:

> Finally, as the United States Supreme Court found vitally important in *Ake*, counsel argued that Lowe needed an expert to provide him with the requisite information to adequately question the State's expert. Ironically, both the trial court and the Court of Appeals seem to opine that Lowe's counsel should have been able to articulate problems with the State expert's opinion by questioning

34

¶93.    In ***Harrison***, this Court held:

> Once the trial developed as it did, however, *with the State's expert offering the only evidence on the crucial element* of rape, fundamental fairness required that Harrison be provided an *expert in pathology* to rebut the testimony of McGarry. *At that point, no amount of lay testimony could have possibly refuted the "objective" opinion of the State's expert.* Due process and fundamental fairness required the lower court to allow the defense access to an independent pathologist and sufficient time to rebut or order a mistrial. Failure to do so constitutes reversible error.

***Harrison***, 635 So. 2d at 902 (emphasis added).  That is the exact situation we have here;  Dr. Hayne offered the only evidence on both the underlying felony of child abuse and the cause and manner of death, and Brown had no way to rebut it.

¶94.    We are not persuaded by the State's reliance on the Court of Appeals' opinion in ***McFadden v. State***, 929 So. 2d 365 (Miss. Ct. App. 2006).  First, the defendant there had changed his story several times about how the injuries to the child occurred– here, Brown has maintained the same story throughout.  ***Id.*** at 367.  Second, the defendant wanted an expert to testify that the child had died from suffocation or Shaken Baby Syndrome instead of blunt-force trauma.  ***Id.*** at 368.  The Court of Appeals found that "even if McFadden had produced an expert to testify that the cause of death was shaken baby syndrome or suffocation,

---

> that expert pretrial, but before obtaining an expert to provide the necessary knowledge to know what questions to ask. *This view presupposes that the State's expert would have assisted Lowe in deciding whether his opinions could be successfully attacked by another expert.* Stated another way, had Lowe's counsel asked the State's expert: "Sir, do you think that another expert appointed by the court to assist Mr. Lowe could successfully attack some of your opinion?" we think the answer—which probably would have been "no"—would have been unhelpful in our analysis.

***Lowe v. State***, 127 So. 3d 178, 183 (Miss. 2013) (emphasis added).

*McFadden would remain guilty of depraved heart murder*," as he admitted that he had shaken the child and that he was the only person who could have effected her death. ***Id.*** at 369 (emphasis added). That is not the case here, as Brown has denied all along that he did anything to harm Le'Anthony, and the only evidence of such is Dr. Hayne's testimony. As we stated recently in ***Lowe***: "Where, as here, the State relies on expert testimony *alone* to connect the defendant to the offense charged, an independent defense expert is part of the 'raw materials integral to building an effective defense,' and the trial judge deprives an indigent defendant of a fundamentally fair trial by refusing him funds to procure such an expert." ***Lowe***, 127 So. 3d 184 (emphasis added).

### B. Brown's Indigence

¶95.	The State argues that Brown is not truly "indigent," as he was able to gather the funds to post bond and to retain his own counsel. The State took this position in its Response to Brown's Motion to Hire Expert, and the trial court appeared to agree.[14] The trial judge cited ***Howell v. State***, 860 So. 2d 704, 720-23 (Miss. 2003), as support for his conclusion that "no authority" existed to allow funds for an expert to a defendant with retained counsel. But ***Howell*** does not hold that the State may *not* provide expert funds for a defendant who has retained counsel – rather, ***Howell*** merely states that there is no authority *requiring* the State to do so. ***Id.*** at 721.

---

[14]As mentioned above, there is no evidence in the record that the trial judge conducted a hearing on Brown's motion. So we go forward with our analysis as though no indigency hearing was conducted.

¶96. Brown swore in his affidavit attached to his motion that he was employed, but that he "[did] not earn enough to pay the estimated fee of $6,600 to hire and secure" an expert. He also swore that he had "no relatives or friends who [were] willing and or able to assist [him] with the funds necessary to hire an expert." And on the first day of trial, when Brown renewed his motion, he testified that his family and friends had helped him pay for his defense counsel. He testified that he made $7.25 per hour at his job as a hotel houseperson at the Isle of Capri casino, and that he had been unable to raise any funds for an expert since his initial motion in 2004. And, of course, Brown has been in prison since the conclusion of his trial in 2006.[15]

¶97. We do not find a prior opinion from this Court that addresses our situation exactly.[16] But other courts have addressed the situation and held that the existence of retained counsel does not, in and of itself, bar a defendant from being indigent for purposes of a state-funded expert. In *State v. Burns*, for example, the Supreme Court of Utah held that "Burns was entitled to a hearing for a determination of whether she was indigent *regardless of who was paying her attorney fees.*" *State v. Burns*, 4 P.3d 795, 803 (Utah 2000) (emphasis added).

---

[15]We note that, upon consideration of Brown's motion for out-of-time appeal, the circuit judge (who was not the judge who presided over the trial, but was the third circuit judge to participate in this case) found: "Attached to one of his previous filings, Brown included an affidavit of poverty. Although he had retained counsel at trial, Brown has now been incarcerated for six years. After questioning Brown at the hearing, this Court found that Brown is indigent and unable to pay the fees and costs of an appeal."

[16]The Court of Appeals recently held that a defendant with retained counsel was not entitled to an expert, but the reasoning focused more on the late nature of the request, coupled with the lack of need (neither of which is present here). *Brandon v. State*, 109 So. 3d 128, 132-134 (Miss. Ct. App. 2013). Also, the Court of Appeals specifically noted that "having private counsel does not in itself prohibit a defendant from being declared indigent." *Id.* at 132.

¶98.    In ***Burns***, the defendant was accused of murdering her six-month-old disabled son. ***Id.*** at 796.  Her father was paying her attorneys' fees, but the case was medically intensive and Burns requested a state-funded expert because her father could not afford that additional expense.  ***Id.***  Rather than deciding if Burns was indigent, the trial court indicated that she could either keep her retained counsel (which would indicate she was not indigent), or she could have counsel appointed from the Legal Defenders Association, which would make funds for expert assistance available.  ***Id.*** at 797.  The Supreme Court of Utah determined this was error and remanded the matter to the trial court to determine if Burns was indigent and entitled to expert-witness funding, which would entitle her to a new trial.[17]  ***Id.*** at 803.  ***State ex rel. Rojas v. Wilkes***, 455 S.E. 2d 575 (W. Va. 1995) (financial assistance provided by third parties which allows a defendant to retain private counsel is not relevant to the defendant's right to have expert assistance provided at public expense); see also ***Ex parte Sanders***, 612 So. 2d 1199 (Ala. 1993) (having counsel retained by a third party did not prevent defendant from being provided state-funded expert if he could show need); ***State v. Vaughn***, 279 S.W.3d 584 (Tenn. Ct. Crim. App. 1993) ("A defendant's status as an indigent is not automatically lost because a private attorney is retained."). ***English v. Missildine***, 311 N.W. 2d 292 (Iowa 1981) ("For indigents the right to effective counsel includes the right to public payment for reasonably necessary investigative services. The Constitution does not limit this right to defendants represented by appointed or assigned counsel. The determinative

---

[17]The Utah court based much of its analysis on certain statutory rights granted to indigent defendants in Utah, but we note that those statutory rights mirror the rights granted to indigent Mississippi defendants via Mississippi caselaw.

question is the defendant's indigency."); ***Rojas***, 455 S.E. 2d at (financial assistance provided by third parties which allows a defendant to retain private counsel is not relevant to the defendant's right to have expert assistance provided at public expense.)

¶99.    In sum, we find that the trial judge erred when he denied Brown's request for expert assistance without conducting a hearing to determine whether Brown was indigent.  Brown was "entitled to a hearing for a determination of whether [he] was indigent regardless of who was paying [his] attorney fees."  We also find that an expert is necessary here in order to make the trial "fundamentally fair."  The trial court's failure to properly consider Brown's request for expert funds requires that we reverse and remand for a new trial.

## V.    The trial court improperly restricted Brown's cross-examination.

¶100.  Although we reverse and remand for a new trial on the expert issue, we also find that the trial judge improperly restricted Brown's cross-examination of Dr. Wells and Dr. Hayne. "The right of confrontation and cross examination is not satisfied by a witness submitting himself to token interrogation but extends to and includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony." ***Myers v. State***, 296 So. 2d 695, 700 (Miss. 1974).

¶101.  During his cross-examination of Dr. Wells, Brown asked her if she "kept up" with immunization studies, and whether she agreed that some of those studies have shown that immunizations "have often caused events in children that mimic Shaken Baby Syndrome." Brown also asked Dr. Wells if "there are some symptoms that you may see in a Shaken Baby diagnosis that you may also see from the use of immunizations?"  The State objected before

Dr. Wells was able to offer a complete answer to these questions, arguing that she had not "been declared an expert in the field of vaccinations and immunizations," although the State offered no evidence of any such specialty. The State did stipulate that Dr. Wells was "a physician and [was] highly qualified." After some discussion, the trial judge sustained the State's objection.

¶102. We find that the trial court's decision deprived Brown of the right to "fully cross-examine" Dr. Wells. Brown's first inquiry was simply whether Dr. Wells was *aware* of any studies that discuss immunization side effects. Dr. Wells certainly could have discussed any studies that she was aware of without expressing an opinion, thus negating any need for her to have been declared an expert in the field. And Brown's second inquiry appeared to be tailored specifically to Dr. Wells's personal medical practice and experience: "[Y]ou are saying that there are some symptoms that *you* may see in a Shaken Baby diagnosis that *you* may also see from the use of immunizations?" (Emphasis added.)

¶103. The trial judge also erroneously limited Brown's cross-examination of Dr. Hayne. Brown attempted to ask Dr. Hayne if he was "aware that during the medical intervention that the medical personnel was holding [Le'Anthony's] head in order to intubate him?" The State objected, arguing that there was no basis in the record for that assertion. The trial judge agreed with the State and sustained its objection. After a thorough review of the transcript, we find that a sufficient evidentiary basis existed for Brown's inquiry. Dr. Wells testified (prior to Dr. Hayne) that "someone . . . was definitely holding [Le'Anthony's] head," and that they had to hold Le'Anthony's head and body because he had "fight about him."

40

¶104. Because we find that Brown is entitled to a new trial, we decline to address his remaining points of error – ineffective assistance of counsel and improper refusal of a proposed jury instruction – as those issues are now moot.

## CONCLUSION

¶105. We find that the amendment to the indictment was proper. We also find that the propriety of the Shaken-Baby-Syndrome theory is improperly before us and that Brown's conviction was based on sufficient evidence and was not contrary to the weight of the evidence. And we also find that the trial judge erroneously restricted Brown's cross-examination of two witnesses. But we ultimately reverse the judgment of the Circuit Court of Coahoma County and remand the case to the trial court for a new trial based on that court's refusal to provide Brown funds for an expert.

¶106. **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER, PIERCE, KING AND COLEMAN, JJ.**

**KITCHENS, JUSTICE, SPECIALLY CONCURRING:**

¶107. I agree with the majority's conclusion that the trial court was in error when it denied the appellant's pretrial request for expert assistance in the absence of a hearing to ascertain whether he was indigent at the time of that application. That he had been able to obtain private, retained legal counsel was not dispositive of that question, and LeeVester Brown's

41

right to a fair trial was violated. Utilization of an expert witness was the *only* way that Brown could defend himself against the testimony of Dr. Hayne.[18]

¶108. I am compelled to write separately, and briefly, to note with dismay that this extremely serious case somehow escaped the attention and action of Mississippi's judicial system for an extraordinary period of six years while two post-trial motions, filed on September 29, 2006, remained open and unheard in the Circuit Court of Coahoma County: a motion by Brown's retained trial attorney requesting leave to withdraw, which stated that Brown wished "to have the Court appoint an attorney at the expense of Coahoma County, Mississippi to represent him on his appeal on the conviction for capital murder," and a simultaneously filed motion in which Brown asked the trial court for permission to file an appeal *in forma pauperis*. The State responded to the attorney's motion, arguing that he should be required to stay on as Brown's counsel. The trial court never ruled on either motion, and Brown's attorney never pursued a decision. Instead, Brown was left to languish in prison, stuck in appellate limbo with no one–not his attorney, and not the trial court–taking the steps necessary to the progress of his appeal.

¶109. After a couple of vain attempts at ineffectual filings without the benefit of a lawyer, Brown, in August of 2012–nearly six years after he was convicted and sentenced–succeeded

_____

[18]Although understandably unmentioned by the majority, I must note Dr. Hayne's impressive and staggeringly productive record as a forensic pathologist. Hayne testified that he had been engaged in the practice of forensic pathology for more than thirty years. According to him, in that time he had participated in approximately *35,000* autopsies. That equates to roughly 1,166 autopsies every year since his career began, or approximately three autopsies every single day of his life for thirty years, all the while also testifying at innumerable trials such as LeeVester Brown's.

in obtaining a hearing in the trial court on his Motion to Show Cause and Motion for Access to Records, which resulted in that court's noting, *inter alia*, that "through no fault of his own, Brown has been denied a right to appeal his conviction."

¶110.  Brown's trial counsel was permitted to withdraw; but the trial court, finding that it lacked jurisdiction to grant an out-of-time appeal, did give him permission to appeal *in forma pauperis* from its order denying that request and appointed appellate counsel for him from the Office of Indigent Appeals.

¶111.  During the last two years, his appeal has taken its course, but approximately six years later than it should have. The familiar saying, "Justice delayed is justice denied," comes to mind; and, in this case, it came to nightmarish fruition. Brown's appeal had merit. The trial against him was not entirely fair. Now he has been incarcerated for more than eight years for a conviction that this Court unanimously decrees cannot stand. Such rank unfairness speaks for itself.

¶112.  Notwithstanding that Brown did achieve some degree of success in this Court, and regardless of the ultimate resolution of the grievous charge he still faces, all of us who bear responsibility for the reliable and timely functioning of our state's criminal justice system should be ashamed of the systemic failure which occurred in the case of Leevester Brown, so much so that we rededicate ourselves to a resolute determination that such a thing will never happen again.

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER, PIERCE, KING AND COLEMAN, JJ., JOIN THIS OPINION.**

43