KITCHENS, Justice,
for the Court:
¶ 1. Jason Isham was convicted in the Circuit Court of DeSoto County of one count of felonious child abuse pursuant to Mississippi Code Section 97-5-39(2). His wife’s two-year-old son, Tommy,[1] was hospitalized in May, 2012, for a severe, traumatic brain injury, which caused severe swelling of the child’s brain, stroke, and permanent weakness on his right side. Because Isham was alone with Tommy when this occurred, he was charged with felonious child abuse of Tommy. At trial, expert medical witnesses for the State testified that Tommy’s injuries resulted from severe blunt trauma. Isham, who was represented by a public defender and a pro bono attorney, requested funds with which to hire his own expert to testify about possible alternative causes for Tommy’s injuries. The trial court denied the request. On appeal, Isham raises one issue: that the trial court erred when it refused him the funds necessary to hire an expert in his defense. In light of this Court’s recent holding in Brown v. State, 152 So.3d 1146 (Miss.2014), we reverse Isham’s conviction and remand the case for a new trial in which the trial court must order public funds for such defense experts as are necessary for the accused to prepare and present an adequate defense.
FACTS AND PROCEDURAL HISTORY
¶ 2. Jason Isham lived with his wife, Mary Beth, and her then-two-year-old son Tommy in DeSoto County, Mississippi. On April 30, 2012, Mary Beth noticed that the back of the child’s head was swollen and mushy, and that Tommy had a 103-degree temperature. Although Tommy had spent the previous few days with his biological father, the child had not exhibited any health problems when he returned to the residence of his mother and Isham. Tommy was treated at LeBonheur Hospital in Memphis, Tennessee.
¶ 3. Dr. Karen Lakin examined Tommy at LeBonheur and noticed “a lot of soft tissue swelling all around his head, in the back of his ears a lot of bruising, ... [a]nd probably the most remarkable is the *1078 amount of swelling that he had and the amount of bruising that he had around his head.” Dr. Lakin diagnosed the child with soft-tissue swelling and significant bruising to the scalp and forehead, concluding that these conditions could not have been caused by a roller-skating accident the week before and “appeared to be from some type of blunt force trauma, but the amount of bleeding was out of proportion to what we would see with a trivial fall.” Dr. Lakin interpreted the child’s injuries to be a result of child abuse, and she therefore reported Tommy’s condition to the Department of Human Services so that it could investigate whether his injuries were the result of “nonaccidental trauma.”
¶4. Tommy returned home from Le Bonheur Hospital with Mary Beth and Is-ham on May 3, 2012. From May 7 to May 9, Tommy stayed at his biological father’s home. The child was fíne throughout that visit. Then, on May 10, he returned to Mary Beth’s custody. On May 11, 2012, after being with his mother and Isham for a day, the child was very drowsy and nauseated. He also reacted very negatively to sunlight.
¶ 5. The next day, Mary Beth fed Tommy some cut-up bites of hot dog and laid him down for a nap between 11:30 a.m. and 12:00 p.m. Mary Beth left the house to run an errand around 12:30 p.m.; but before she had been gone more than ten minutes, she received a frantic phone call from Is-ham informing her that Tommy was unresponsive and was having trouble breathing. Mary Beth immediately returned home and attempted to perform CPR on Tommy.
¶ 6. An ambulance was called, and it transported Tommy to the emergency room at Baptist DeSoto Hospital. There, he was treated by emergency room physician Dr. Rosa Gomez. The child was blue from oxygen deprivation, and his body was very “spastic,” alternating between conditions of extreme rigidity and extreme flaccidity. His left pupil was blown, meaning that it was large and nonreactive, indicating that the child had severe internal bleeding within his skull. When Tommy arrived at the emergency room, no medical professionals observed the presence of external injuries to his person.
¶ 7. Because emergency room physicians suspected that Tommy had suffered a traumatic brain injury, the child was then airlifted from Baptist DeSoto Hospital to LeBonheur Hospital in Memphis, where he was treated by Dr. Stephanie Einhaus, a pediatric neurosurgeon. When Tommy arrived at LeBonheur, a CAT scan revealed a blood clot on the right side of his brain as well as a significant bruise, or contusion, on the left side of his brain. Dr. Einhaus performed emergency surgery to relieve the swelling in his brain, which entailed removing a window of bone from the skull to allow the brain room to swell. After the surgery, the child experienced several other complications. His brain continued to swell despite Dr. Einhaus’s efforts, which included draining fluid from the brain and placing Tommy in a medically induced coma. Dr. Einhaus discovered that Tommy had suffered a stroke in the left side of his brain, for which emergency surgery on the right side of the child’s brain was necessary to prevent another stroke and further damage from swelling.
¶ 8. The child survived the trauma and the surgeries; but he had to relearn to talk and has permanent weakness on the right side of his body. Because Tommy had exhibited signs of abuse on April 30, 2012, while he was in the care of Isham, because Tommy did not begin to show injuries until he began living in Isham’s home, and because Tommy exhibited serious head injuries consistent with abusive blunt-force trauma and shaking after being *1079 in Isham’s care, Jason Isham was charged with felonious child abuse pursuant to Mississippi Code Section 97-5-39(2).
¶ 9. Before trial, Isham designated two experts, Dr. Terry Moore and Dr. Joseph Wippold. Isham stated that Dr. Moore, a professor of internal medicine and pediatrics and director of pediatric rheumatolo-gy, diagnosed Tommy with Systemic Lupus Erythematosus and CNS Vasculitis. Dr. Wippold, a neuroradiologist, opined that nonaccidental trauma was not the cause of Tommy’s head injuries. On October 17, 2013, eleven days before trial was to begin, Isham filed his Motion for State to Pay for Expert Fees and for Continuance if Necessary to Secure Attendance or Testimony, requesting funds “to pay the expenses of obtaining the presence at trial of his identified experts ... or alternatively to pay the expenses of securing deposition testimony to be presented at trial.” He stated that he was indigent and that the trial court had appointed a public defender to represent him, and that he also was represented by pro bono counsel. He explained that the testimony of Drs. Moore and Wippold would be necessary for his defense.
¶ 10. The trial court held a hearing on the motion for funds on October 22, 2013. Isham’s counsel informed the court that Isham was indigent, as evidenced by the court’s having appointed him a public defender. Isham’s counsel explained that, because the State had the benefit of medical experts, it was only fair for Isham to be given the opportunity to consult an expert and “to provide an explanation for the observations and the condition of the child in this case.”
¶ 11. The trial court agreed that Isham probably should have an expert. “In a perfect world, I suppose that the county should be required to provide the defense with — an indigent defendant with experts. However, I don’t know that I have any authority to order that.” The State contended that the proposed defense experts would be unavailable for trial on the date for which it was set, and that a continuance would be necessary to guarantee their appearance. The State also contended that Isham was not indigent because he had been released on a $50,000 bond.
¶ 12. Ultimately, the trial court denied Isham’s motion for expert funding. It analyzed the three-factor test which the United States Supreme Court articulated in Ake v. Oklahoma, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985):(1) the private interest affected by the action of the state; (2) the governmental interest affected if the safeguards are provided; and (3) the probable value of the additional or substitute procedural safeguards that are sought and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. It then cited Brandon v. State, 109 So.3d 128 (Miss.Ct.App.2013), for the proposition that expert funding is “conditioned upon a showing that such expenses are needed to prepare and present an adequate defense.” The trial court concluded that the defendant had not provided a concrete reason for requiring defense experts in the case “other than counsel’s statement that they need an expert.” The trial court also found the motion to be untimely, as it was filed eleven days before trial was scheduled to begin. The trial court stated that it was going to permit liberal cross examination of the State’s witnesses, but that it would deny Isham’s motion for expert funding.
¶ 13. Isham’s trial commenced on October 28, 2013. Isham proceeded with no experts in his defense. The State’s casein-chief included the testimony of three expert witnesses.
¶ 14. First, Dr. Gomez, the physician who had treated Tommy in Baptist DeSoto *1080 Hospital’s emergency room during his second hospitalization, was accepted as an expert in the field of emergency medicine. Dr. Gomez testified that when the child arrived at the emergency room, he was on the brink of death. He had turned blue from lack of oxygen, and he could not even swallow on his own. She testified that she was concerned Tommy had a bleed inside his head.
¶ 15. Next, Dr. Einhaus, the physician who performed Tommy’s brain surgery, was accepted as an expert in the field of pediatric neurosurgery. As for the contusion that doctors had identified on the left side of the child’s brain, Einhaus testified that the only cause for such an injury was “blunt force trauma period.” Under cross-examination, Einhaus reiterated her conclusion that “the only thing that ... could have caused [Tommy’s] pathology is blunt force.” Einhaus further testified that the patient did not have a bleeding disorder that could have explained his injury.
¶ 16. Finally, Dr. Lakin, the physician who had reported Tommy’s injuries to the authorities as abuse and treated him after surgery, was accepted as an expert in general pediatrics and child-abuse pediatrics. Lakin testified that, in her opinion, the significant soft-tissue swelling could not be explained by Tommy’s medical history. She stated that some of the redness and contusions were considered “battle sign[s],” meaning signs of abuse. Although the child had fallen approximately ten days earlier while he was roller skating, Lakin testified that there was no history of “significant trauma that would explain the extent of the bleeding and the swelling that we saw.” Mary Beth’s family had a history of bleeding disorders, but Dr. Lakin testified that the extent of the bleeding could not be explained by any type of bleeding illness or disease. She concluded that Tommy’s condition “appeared to be from some type of blunt force trauma, but the amount of bleeding was out of proportion to what we would see with a trivial fall.”
¶ 17. With regard to the child’s health after his brain surgery, Dr. Lakin testified that there was no medical history of trauma that would explain his second set of injuries. She stated that the injury could not have resulted from trivial trauma, but that Tommy suffered “a life threatening injury that almost killed him.” She testified that Tommy’s injuries, a subdural hemorrhage in the brain combined with bilateral retinal hemorrhages — caused when blood vessels behind the retina rupture and hemorrhage — “were consistent with abusive head trauma.” She went on to say that, although the subdural hemorrhaging is consistent with blunt-force trauma, retinal hemorrhaging is more consistent with severe shaking.
¶ 18. At the close of trial, Isham was convicted of felonious child abuse and sentenced to thirty years in prison, followed by fifteen years of post-release supervision and a fine of $10,000. Isham has timely appealed.

ANALYSIS

¶ 19. Isham raises one issue on appeal. He contends that the “trial court erred in refusing to provide Isham funds to hire an expert witness with regard to the nature of and cause of Tommy’s injuries.”
¶20. Although we review a trial court’s denial of expert assistance under an abuse-of-discretion standard, “[w]e will not hesitate to reverse a trial court’s denial of expert assistance to an indigent defendant when the lack of expert assistance denied the defendant due process such that the trial was rendered fundamentally unfair.” Lowe v. State, 127 So.3d 178, 181 (¶ 14) (Miss.2013) (citing Fisher v. City of *1081 Eupora, 587 So.2d 878, 888 (Miss.1991)). Accordingly, this Court’s task is to determine whether the trial court’s refusal to provide funds for expert assistance to Is-ham rendered his trial fundamentally unfair.
1. Whether the trial court’s denial of expert assistance rendered Isham’s trial fundamentally unfair.
¶ 21. The United States Supreme Court “has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.” Ake, 470 U.S. at 70, 105 S.Ct. 1087.
¶ 22. In Ake v. Oklahoma, the United States Supreme Court addressed an indigent defendant’s right to expert witnesses, concluding that the right at stake implicated a criminal defendant’s access to justice:
Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the' adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.
Id. at 76, 105 S.Ct. 1087. The Court also wrote that “fundamental fairness entitles indigent defendants to ‘an adequate opportunity to present their claims fairly within the adversary system’ ” and that courts implement this principle by identifying the tools of an adequate defense and providing them to indigent defendants. Id. at 77, 105 S.Ct. 1087.
¶ 23. Similarly, in Lowe v. State, 127 So.3d 178 (Miss.2013), this Court examined a criminal defendant’s right to a fair trial in the context of an indigent litigant’s request for funds to hire an expert to assist in his defense. In Lowe, the defendant was convicted of five counts of exploitation of a child with regard to images that he allegedly had downloaded onto his laptop computer. Id. at 179 (¶ 1). Because the State’s entire case “relied solely on the opinions of its expert witness to establish that the files existed on Lowe’s laptop,” Lowe requested funds for an independent expert in computer forensics “to examine the computer’s hard drive and to refute the State expert’s allegations.... ” Id. at 183 (¶¶ 21-22). The trial court denied the request.
¶ 24. This Court reversed Lowe’s conviction and remanded for a new trial because the denial of expert assistance rendered his trial fundamentally unfair. Id. at 184 (¶ 26). Citing the United States Supreme Court’s decision in Ake, this Court recognized that the defendant’s right to an expert to assist in his defense derived from the Fourteenth Amendment’s guarantee of due process and that “justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.” Lowe, 127 So.3d at 182 (¶ 16) (quoting Ake, 470 U.S. at 76, 105 S.Ct. 1087).
¶ 25. For an indigent defendant to be entitled to public funds to retain an expert, the expert must be a “basic tool of an adequate defense.” Id. (¶ 17). In order to establish whether an expert is a “basic tool for an adequate defense,” the Court must analyze (1) the private interest that is affected by the action of the state; (2) the governmental interest that is affected if the safeguard is provided; and (3) the probable value of the additional or substitute procedural safeguards that are *1082 sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. Id. (quoting Ake, 470 U.S. at 77, 105 S.Ct. 1087).
¶ 26. Under the first prong, the private interest involved is an individual’s interest in accurate criminal proceedings, which is “uniquely compelling” and heavily weighs in the individual’s favor. Id. (¶ 18).
¶27. Next, we consider the second prong, which is the governmental interest that is affected if the safeguard is provided. Under this prong, we consider the fact that the county has a pecuniary interest at stake in Isham’s retention of an expert, given that the county government must provide funds for a court-ordered expert. This interest, however, is insubstantial, comparatively speaking, and the government’s interest in prevailing at trial is outweighed by the government’s interest in resolving criminal cases fairly and accurately. Id. at 182-83 (¶ 18). Accordingly, in this case, both Isham’s and the government’s interest in a fair and accurate criminal trial far outweigh the county government’s pecuniary interest in the public funds it must pay to compensate Isham’s expert witnesses.
¶28. Finally, the third prong, which this Court analyzes the most intensely, requires the trial court to balance the probative value of expert testimony for Isham against the risk of not providing him expert assistance.
¶ 29. In Lowe, this Court held that Lowe’s need for an expert was vital, because an expert could refute the State’s allegations and assist Lowe in cross examining the State’s expert. The Court noted that the State was required to prove that it was Lowe himself who had downloaded certain images onto the computer, and that it could not prove that element of the crime without expert testimony. Id. at 183 (¶ 21). The Court summed up its reasoning:
Where, as here, the State relies on expert testimony alone to connect the defendant to the offense charged, an independent defense expert is part of the “raw materials integral to building an effective defense,” and the trial judge deprives an indigent defendant of a fundamentally fair trial by refusing him funds to procure such an expert.
Id. at 184 (¶ 24) (emphasis added).
¶ 30. This Court very recently confronted the issue of expert assistance for a defendant accused of causing the death of his young son by striking and shaking him, causing severe head and brain trauma. In Brown v. State, 152 So.3d 1146 (Miss.2014), Leevester Brown was convicted of the capital murder of his son, who died of symptoms that Dr. Steven Hayne, a pathologist, deemed consistent with shaken-baby syndrome. Id. at 1156-57. Although there were no external bruises or abrasions, Brown’s son suffered a subdural hemorrhage, meaning that blood had collected between the child’s brain and skull, causing brain swelling, a midline shift, and compression of the brain stem. Id. at 1156 (¶ 43). Dr. Hayne also observed retinal hemorrhaging and determined that the retinal and subdural hemorrhaging were consistent with shaken-baby syndrome. Id. at 1157 (¶ 46).
¶ 31. Prior to trial, Brown requested funds with which to hire a medical expert to challenge Dr. Hayne’s testimony regarding the cause of death of Brown’s child. Id. at 1165 (¶ 89). The trial court denied the motion because Brown had been able to post his own bail bond and retain his own legal counsel and had “made his own choices as to where to pay his monies.” Id. Brown also submitted an affidavit showing his present condition of indigency. Id. This Court agreed with *1083 Brown that the proof of the charge against him consisted of the medical diagnosis and testimony of Dr. Hayne, and that the trial court’s refusal to grant Brown the funds with which to retain an expert had denied him “‘the raw materials integral to the building of an effective defense,’ as he had absolutely no way to counter the State’s sole evidence of the cause of death, or even to determine the proper questions to ask to challenge Dr. Hayne on cross.” Id. at 1166 (¶ 92). The Court reversed, finding that “Dr. Hayne offered the only evidence on both the underlying felony of child abuse and the cause and manner of death, and Brown had no way to rebut it.” Id. (¶ 93). This was reversible error because it rendered his trial fundamentally unfair. Id. (¶ 94) (citing Lowe, 127 So.3d at 184).
¶ 32. The Court also examined whether Brown was sufficiently indigent to require state funding for his expert. It held that the fact that Brown had been able to retain private counsel did not foreclose his obtaining state funds with which to pay for an opposing expert, and that the trial judge had erred when he had denied Brown’s request without fully determining Brown’s personal indigence. Id. at 1169 (¶ 99). Ultimately, because the expert was necessary to make the trial fair, the “trial court’s failure to properly consider Brown’s request for expert funds require[d] that we reverse and remand for a new trial.” Id.
¶ 33. The mandate of Lowe and Brown is abundantly clear: if the State relies on expert testimony alone to prove or corroborate an element of the crime, then the defendant is entitled to an expert to assist in his defense and preparation for cross-examination. In such cases, the assistance of an expert is “a basic tool to an adequate defense,” without which the defendant cannot receive a fair trial.
¶ 34. In this case, to convict Isham of felonious child abuse, the State was required to prove that Isham himself caused the injuries to Tommy by sufficiently whipping, striking, or otherwise physically abusing or mutilating him to cause serious physical harm. See Miss.Code Ann. § 97-5-39(2)(c)(iii) (Rev.2014). The State clearly proved that Tommy had suffered serious physical harm, and it showed that the harm seemed to occur whenever Tommy was in Isham’s custody. However, the State also was required to prove that Is-ham had caused Tommy’s injuries through hitting, striking, or otherwise abusing him, not only beyond a reasonable doubt, but, as this was a circumstantial evidence case, to the exclusion of every reasonable hypothesis consistent with innocence. See Montgomery v. State, 515 So.2d 845, 848 (Miss.1987). Accordingly, it was essential to the State’s case that it prove that the child’s injuries were inflicted through blunt force or abusive nonaccidental trauma and that they could have been sustained by the child only through such nonaccidental trauma. It is unquestionable that the State’s experts were the only source of the testimony concerning these essential components of the prosecution’s proof.
¶ 35. Dr. Lakin, who treated Tommy on both April 30 and May 12, 2012, testified that the child exhibited “battle signs”— evidence of abuse — when he came in for his soft-tissue swelling and bruising on April 30. On May 12, when Tommy became nonresponsive and required emergency brain surgery to save his life due to severe internal bleeding and swelling of the brain, everyone who treated him testified that he had no outward indications of blunt-force trauma that would have caused such an injury. However, Dr. Einhaus, who performed the life-saving surgery on the child, testified that the subdural hema-toma that was found in the brain was caused by “blunt force trauma period” and *1084 “the only thing that ... could have caused [Tommy’s] pathology is blunt force.” Dr. Lakin also testified that Tommy’s injuries “were consistent with abusive head trauma.” Additionally, this expert testified that Tommy had hemorrhaging under his eyes that was consistent with severe shaking.
¶ 36. All of the foregoing testimony was used to prove that Isham had caused serious bodily harm to Tommy through blunt-force trauma. It also was used to show that blunt-force trauma was the only way that Tommy could have received his injuries. As in both Lowe and Brown, the evidence against Isham was entirely circumstantial, and the State’s primary evidence showing that Isham had committed the crime came through expert testimony. The trial court’s denial of expert assistance to Isham prevented his trying to develop a “reasonable hypothesis consistent with innocence.” It also denied him the opportunity to develop his defense in general and to improve his ability to question the State’s experts. Although Isham’s attorney may have been afforded liberal cross examination of the State’s witnesses, he was left to figure out those questions on his own, without expert assistance.
¶ 37. Further, Isham provided the court information indicating that expert witness testimony was crucial to establishing his defense. He made the trial court aware that Dr. Moore believed that Isham had suffered from a form of lupus, which could have caused his injuries, and that Dr. Wippold, a neuroradiologist specializing in the diagnosis of brain trauma, believed that Tommy was injured through accidental trauma. It is possible that these could have formed the basis of a reasonable hypothesis consistent with innocence. Furthermore, it is clear that a rigorous cross examination of the State’s experts would not produce this sort of information in front of a jury. Ultimately, although Isham filed the motion eleven days before trial was set to begin, the interest in providing a fair trial to the accused far outweighs the interest of the trial court in keeping a timely docket.
¶ 38. It is clear from the record that the trial court denied Isham’s motion for funds to retain an expert not just because the motion was untimely but also because it misapplied Ake and its progeny. The court opined: “[i]n a perfect world, I suppose that the county should be required to provide the defense with — an indigent defendant with experts. However, I don’t know that I have any authority to order that.” It is clear that Isham required the assistance of medical experts as “a basic tool of an adequate defense.” Lowe, 127 So.3d at 182 (¶ 17). The State could not have proved its case against Isham without expert testimony, and the trial court deprived Isham of his right to a fair trial when it denied him funds to procure opposing experts.
2. Indigence
¶ 39. In order to be entitled to a State-funded expert, a criminal defendant must prove not only that the expert is necessary to the preparation of his defense, but he also must prove his indigency. Ake, 470 U.S. at 70, 105 S.Ct. 1087. Here, the trial court’s order assigning Is-ham a public defender clearly indicates that he was financially unable to pay for an attorney, and the case proceeded on the basis that Isham was indigent. Moreover, although Isham was released on a $50,000 bond, this fact is not dispositive of Isham’s indigent status. Here, Isham’s mother was paying for his bail bond in monthly installments, and she had not paid it in full “by any stretch.”
¶ 40. In Brown, we held that “the existence of retained counsel does not, in and *1085 of itself, bar a defendant from being indigent for purposes of a state-funded expert.” Brown, 152 So.3d at 1168 (¶ 97). Similarly, the fact that a defendant was able to post bail does not, in and of itself, determine such defendant to be financially able to hire his own experts.
¶ 41. Here, nothing in the record suggests that the trial court doubted Isham’s indigence. Moreover, the trial court did not deny Isham’s motion for expert funds because he was not indigent. Instead, the trial court denied the motion because it thought it was not within the power of the trial court to award those funds and because the court deemed Isham’s motion to have been untimely.

CONCLUSION

¶42. The trial court’s denial of funds for the procurement of expert witnesses denied Jason Isham his due process rights under the Fourteenth Amendment to the United States Constitution and Article 3, Section 14, of the Mississippi Constitution and denied him his right to a fair trial. Accordingly, we reverse Isham’s conviction and remand the case for a new trial in the Circuit Court of DeSoto County.
¶ 43. REVERSED AND REMANDED.
DICKINSON, P.J., LAMAR, KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND PIERCE, JJ. WALLER, C.J., NOT PARTICIPATING.

. Because of the child's minority, this Court will refer to him by the pseudonym, Tommy.