# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00964-COA

**ROBERT MASON A/K/A ROBERT LANIER MASON A/K/A ROBERT L. MASON**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:                07/23/2021
TRIAL JUDGE:                HON. GERALD W. CHATHAM SR.
COURT FROM WHICH APPEALED:  DESOTO COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:          JOHN W. CHAMPION
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                REVERSED AND REMANDED - 03/14/2023
MOTION FOR REHEARING FILED:

### BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.    A DeSoto County Circuit Court jury found Robert Mason guilty of child exploitation by receiving and distributing child pornography in violation of Mississippi Code Annotated section 97-5-33(3) (Rev. 2014). The circuit court sentenced him to serve ten years in the custody of the Mississippi Department of Corrections with ten years of post-release supervision. On appeal, Mason argues that the circuit court erroneously (1) denied his motion for funds to retain an expert in computer forensics and (2) allowed three inflammatory, prejudicial videos of child pornography to be shown to the jury even though the defense offered to stipulate to the content and probative effect.

¶2.     We find reversible error in the trial court's denial of funds for an independent defense expert. We also note other evidentiary errors made at trial due in part to Mason's lack of an expert. Accordingly, we reverse Mason's conviction and remand the case for a new trial where the trial court will order public funds for a defense expert in order for Mason to present an adequate defense.

## FACTS AND PROCEDURAL HISTORY

¶3.     Between January 10 and 16, 2019, child pornography videos and images were shared by Mason's computer in Cordova, Tennessee, with Detective Chip Logan's computer in DeSoto County, Mississippi, through the investigative software program "Torrential Downpour." This law enforcement software is designed to monitor the downloading and distribution of child pornography through peer-to-peer file-sharing networks, such as BitTorrent, a legal program Mason used.[1]

¶4.     Detective Logan works for the Criminal Investigations Division of the DeSoto County Sheriff's Department and is its supervisor of the Internet Crimes Against Children (ICAC) Task Force. This unit investigates the downloading and distribution of child pornography. Detective Logan also monitors and supports the division's digital forensics lab.

¶5.     At trial, Detective Logan was the sole witness for the State's case-in-chief, and the

---

[1] A peer-to-peer network allows users to distribute large amounts of data over the Internet such as movies, videos, music, and images. *United States v. Owens*, 18 F.4th 928, 931 (7th Cir. 2021). Unlike a centralized network, "which relies on a single server to provide an entire file directly to each user," peer-to-peer networks "enable users to download portions of a file from numerous other users simultaneously," which increases download speed. *Id.*

defense called no witnesses. Even though Detective Logan and the State insisted that he was not an expert, his testimony was highly specialized and technical. Throughout trial, Mason's counsel objected repeatedly to Detective Logan's testimony as requiring specialized knowledge, but the trial court overruled each objection.

¶6.     Detective Logan testified that he did not have a degree but had received specialized training for the online investigation of offenders sharing child pornography. His initial, basic training for ICAC was conducted by the Mississippi Attorney General's Office. He testified that the training takes a person with little computer knowledge and teaches the person how to use the investigative software and how child pornography files are transferred on the Internet. The training also includes topics on peer-to-peer networks like BitTorrent, which is usually how child pornography is transferred on the Internet, as well as other networks. After completing the training, Detective Logan earned a license issued by the Department of Justice to begin online investigations through the Torrential Downpour software. While he has testified approximately five times in both state and federal court about sharing child pornography on computers, he has never been qualified as an expert because "as much as I would like to consider myself to be an expert, I'm not. It doesn't take an expert to use these programs. My job is strictly to verify what the software program [Torrential Downpour] provides. . . . I'm a user of the program . . . ."

¶7.     Detective Logan testified in "the most basic, layman's terms" about how he uses the Torrential Downpour software. The program runs constantly, and he monitors it twice a day. The program will show if there is an Internet Protocol (IP) address that has downloaded or

distributed a "torrent," which is a folder that contains multiple files. The program will flag and notify him only if those files contain child pornography or child sex-abuse material. Detective Logan testified that most of the child-pornography file names "are pretty descriptive" and accurately portray what they contain. Even so, Detective Logan clicks on the flagged files to view them and verify that they contain child pornography. If so, he initiates an investigation to locate the IP address and the physical address associated with it, the device at issue, and the person responsible for downloading and distributing the material.

¶8. Detective Logan testified about how BitTorrent generally works. Users can both obtain files from or give files to another user. Detective Logan testified that peer-to-peer network software is used to move large data files quickly by receiving the file from multiple computers instead of just one source. Detective Logan gave examples of file contents, such as Word documents, Excel spreadsheets, movies, videos, or photographs and said, "[I]f you're looking for something specific, you can type [key words] in your computer . . . and download it from other people." He explained that at the same time you are receiving files, you are also giving or distributing files to other BitTorrent users. In order to download files, someone has to have those files and make them "available." "You're downloading this specific file from multiple sources, and in doing so, you're also making it available." After typing the keywords in the search bar, "files or torrents that have multiple files in them that have those key words" appear, and "you just . . . click to download [and] . . . those files start pulling from other peers."

¶9. Detective Logan also testified how BitTorrent, which is available to the public, compared to Torrential Downpour, which is available only to law enforcement. A law enforcement computer with Torrential Downpour software on it does not receive files from multiple sources, as BitTorrent would, but only one specific IP address that is making child pornography available. Detective Logan testified that he does not actively obtain files from the computer at issue; instead, "when a file is being downloaded that contains child pornography, my computer attempts to make a connection with that computer. When a connection is made, those files are transferred or distributed to my computer, so therefore, I can view them and say these files are being transferred or distributed."

¶10. Detective Logan testified that Mason made his child pornography files available to "anybody on the BitTorrent network specifically searching for those files." Searching for a file would not download it—a person would have to select the option to download a specific file. Further, Detective Logan testified that Torrential Downpour creates a record of when any IP address downloads a torrent containing child pornography or child sex-abuse material.

¶11. However, Detective Logan testified that he was not an expert on how to use Torrential Downpour, and his job was "strictly to verify what the software program provides." Also, he could not explain how the BitTorrent network interacted with the Torrential Downpour software. Detective Logan conceded that he did not know who had specifically downloaded the child pornography on to Mason's computer, and he could not say which search terms were used to obtain the files. Detective Logan did explain that many

files contained keywords such as "PTHC" (which stands for preteen hardcore), "kiddy" (referring to kiddy porn), and "Y-O" (which is used to indicate age, such as a one-year-old or two-year-old).

¶12. Detective Logan testified that it was impossible for a file to be accidentally shared with another individual using BitTorrent. Further, it was impossible for a user to be unaware he or she was sharing files through BitTorrent. Before downloading the program, a user must agree to the user agreement, which informs the user that "use of the software to download files will in turn enable other users to download pieces of those files from [him], thereby maximizing download speeds for all users." There is an option to disable sharing, but this option had not been selected on Mason's computer.

¶13. Detective Logan testified that in January 2019, he received notice through Torrential Downpour that a device accessing the Internet through a specific IP address was downloading and distributing child pornography materials through the BitTorrent network. Between January 10 through 16, 2019, the device associated with the IP address shared or distributed several thousand files. Detective Logan viewed the files and verified that they contained child pornography. Detective Logan subpoenaed the internet service provider to determine the subscriber information for the IP address associated with the files. He obtained the physical address, located in Cordova, Tennessee, and contacted authorities in Memphis, who had jurisdiction over the initial investigation. Occupants at this address included Mason, his wife Pam, and one adult son. The Memphis Police Department obtained an investigative search warrant of the residence, as there was no probable cause for

6

an arrest at this point.

¶14. Detective Logan accompanied the Memphis police officers who executed the search warrant. Mason willingly talked to the officers and denied downloading or distributing any child pornography, claiming that he only used his computer to look for bridge maps, review ancestry, and download books and movies using BitTorrent. The Memphis Police Department seized multiple laptops and computers from his residence.

¶15. Mason admitted that the laptop next to a recliner was his. The username associated with the laptop was "KG." When asked by Detective Logan what the initials stood for, Mason admitted it was short for "Knott Given," a term Detective Logan testified was a reference to bestiality, which is often involved with child pornography. Mason told Detective Logan his wife would not have used this laptop, and his son was not living at home during the dates of the downloads at issue.

¶16. The seized devices were brought to DeSoto County, where Detective Logan obtained a search warrant to examine the computer files. Initially, he testified that a forensic analysis of each device and all its files was ordered, but to make it easier on the in-house digital forensic lab, a preview of each device was done through a "write blocker." Detective Logan explained that a write blocker allows him to look at a device without making any changes to it. He prioritized Mason's laptop.

¶17. On the laptop, Detective Logan found several thousand child pornography files, including the exact files received by Detective Logan's computer in DeSoto County through the BitTorrent network from Mason's IP address. In total, Detective Logan testified that he

7

found fifty-five hours of child pornography or child sex-abuse material on Mason's laptop that matched the child pornography files that came to Logan's computer. Detective Logan created a Word document listing the file paths and names that contained child pornography on Mason's computer. Detective Logan wrote a brief description of what the files contained. Ultimately, this list was entered into evidence as Exhibit 4 over defense counsel's objection.

¶18. During the investigation, Detective Logan testified that issues arose while "imaging" Mason's laptop. He explained that "imaging" is taking a "digital photograph"—or "cloning"— of everything on the hard drive, which would include all data, documents, search histories, and deleted items. In this way, the investigators could examine the image of the hard drive but not the device itself. However, Detective Logan testified that when the investigators tried to "image" Mason's hard drive, it failed entirely and would not work. They could not create an image of it but were able to plug his hard drive into their computer and view the files, file paths, and folders on his computer. They then took screen-shots of the files, paths, and folders on the hard drive, which was entered into evidence as Exhibit 6, over objection by the defense. Certain file folders at issue were marked by law enforcement on the screenshot.

¶19. A few days after the search of Mason's laptop, an arrest warrant for Mason was issued in DeSoto County for distribution of child pornography. Detective Logan requested that Mason come to DeSoto County to be arrested, and Mason complied. At the DeSoto

County Sheriff's Department, Mason was advised of his *Miranda*[2] rights and interviewed. Mason told Detective Logan that he did not understand how the child pornography got on his computer and proposed that he had been hacked.

¶20.   Before trial, in October 2020, Mason filed a motion for funding to appoint a computer and software expert witness to assist with his defense.[3] (Mason had been deemed indigent and could not procure his own expert.)  In the motion, defense counsel argued that after viewing the software and electronic data allegedly extracted from Mason's computer, she needed an expert in order to determine the forensic pathways and algorithms, as well as the accuracy of the data presented to the jury.  Further, at the motion hearing,[4] she argued that trying this case required specialized knowledge of computer programs that she did not possess.  The trial court denied Mason's request because the State supposedly was not relying on expert testimony to prove any elements of the alleged crime; therefore, a defense expert witness would not be a "'basic' tool of an adequate defense."[5]

## DISCUSSION

¶21.   The determinative issue on appeal is the failure of the trial court to provide funds for

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] A few days before trial, Mason also filed a motion in limine.  One item he requested be limited was any testimony related to BitTorrent, computer forensics, or the forensics of Mason's computer because the State had not proffered an expert in these fields, which would require the specialized and technical knowledge of an expert.

[4] The motion, filed in October 2020, was not heard until January 5, 2021.

[5] *Isham v. State*, 161 So. 3d 1076, 1081 (¶25) (Miss. 2015) (quoting *Lowe v. State*, 127 So. 3d 178, 182 (¶17) (Miss. 2013)).

an expert witness in computer forensics for Mason. Finding reversible error with this issue, we decline to address the second issue Mason raised regarding the admission of inflammatory videos at trial. Additionally, we will discuss other evidentiary errors that contributed to Mason's fundamentally unfair trial.

## I. Funds for a Defense Expert

¶22. Mason's expert-witness argument is two-fold. He claims that Detective Logan should have been designated as an expert in accordance with Mississippi Rule of Evidence 702 because of his highly technical testimony. Second, Mason contends he was entitled to an expert witness to refute the specialized knowledge of Detective Logan's testimony, regardless of whether he was deemed an expert. Because the trial court denied his request for funding an expert, Mason argues he was denied a fundamentally fair trial. We agree.

¶23. Appellate review of a trial court's denial of expert assistance is made using an abuse-of-discretion standard: "We will not hesitate to reverse a trial court's denial of expert assistance to an indigent defendant when the lack of expert assistance denied the defendant due process such that the trial was rendered fundamentally unfair." *Isham v. State*, 161 So. 3d 1076, 1080-81 (¶20) (Miss. 2015) (quoting *Lowe v. State*, 127 So. 3d 178, 181 (¶14) (Miss. 2013)).

### A. Detective Logan should have been considered an expert witness.

¶24. Because Mason's case was based entirely on the use of computers, computer software, and specialized networks, his counsel recognized the need for an expert in the area of computer forensics months before trial. The trial court denied the defense's motion for

expert funding because there was no showing that the State intended to rely on an expert to prove the crime charged. Instead, the State offered Detective Logan as its sole witness, insisting he was not an expert. Mason rested without calling any witnesses. Detective Logan also testified that he was not an expert, pointing out that he had served as a witness in five prior trials involving child pornography and never been qualified as an expert. While the State argues his training was "not technical" and that his testimony was "not complex," we disagree.

¶25.     Mississippi Rule of Evidence 701 governs lay testimony and provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[6]     At trial, Detective Logan's testimony indicated his specialized knowledge, skill, and experience in computers, networks, and peer-to-peer software went far beyond that of an ordinary person. His testimony was highly technical, scientific, and complex. Torrents, key search terms for child-pornography file sharing, write blockers, computer forensic reports, file paths, hash values, digital fingerprints on manipulated or transferred files, and the correlation of bestiality and child pornography were just a few of the topics Detective Logan testified about, in addition to the BitTorrent and Torrential Downpour software. While Detective Logan tried to downplay his lack of expertise at trial,

---

[6] Rule 702, which governs expert witness testimony, provides in pertinent part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . .

11

we are not persuaded. Further, Detective Logan had received specialized training and received a license for investigating digital child pornography, including how to operate Torrential Downpour and peer-to-peer networking-computer-software programs, a highly technical field. This training and licensure show the technical nature of his job.

¶26. *Travelstead v. State*, 232 So. 3d 752 (Miss. Ct. App. 2017), is instructive on law enforcement testifying as experts in a factually similar case involving peer-to-peer networks distributing child pornography. The defendant's apprehension unfolded in a similar manner as Mason's, with law enforcement software flagging IP addresses that were suspected of downloading and sharing child pornography. *Id.* at 755 (¶3). At trial, two of the three officers were qualified as experts for the State. *Id.* at 756 (¶8) & nn.3 & 5. One agent was certified as a computer-forensic examiner with the FBI and was admitted as an expert in the field of computer forensics. *Id.* at n.3. Another investigator was admitted as an expert in peer-to-peer network sharing, undercover child-exploitation cases, and cybercrimes. *Id.* at n.5. Ultimately, the defendant was convicted of child exploitation, and this Court affirmed. *Id.* at 755 (¶¶1-2).

¶27. The nature of Detective Logan's testimony is similar to that found in *Travelstead* but without his being designated as an expert. The State's trial strategy appeared to be that since it was not offering Detective Logan as an expert, the trial court did not have to provide an expert for Mason. However, this is not the law. "An indigent's right to defense expenses is 'conditioned upon a showing that such expenses are needed to prepare and present an adequate defense.'" *Eubanks v. State*, 291 So. 3d 309, 316 (¶20) (Miss. 2020) (quoting

12

*Green v. State*, 631 So. 2d 167, 171 (Miss. 1994)). Mason's need for an expert was not predicated on whether the State had an expert[7] but whether Mason would be denied an adequate defense without one. As we will discuss in the next issue, Mason was denied an adequate defense without an expert.

**B.    Mason's defense was prejudiced by the denial of funds for an expert.**

¶28.    Mason argues the trial court erred by failing to provide an expert in computer forensics in order for Mason to prepare his defense, properly cross-examine the State's witness, and testify in support of Mason's defense. We agree. The trial court's denial of funds for an expert made Mason's trial fundamentally unfair.

¶29.    The Mississippi Supreme Court, following the dictates of "[t]he United States Supreme Court[,] 'has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.'" *Lowe*, 127 So. 3d at 181 (¶13) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). In providing expert assistance for defendants, the Mississippi Supreme Court has held:

> This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair.

*Eubanks*, 291 So. 3d at 316 (¶20) (quoting *Johnson v. State*, 529 So. 2d 577, 590 (Miss.

---

[7] Mason did not raise as a separate issue on appeal that Detective Logan testified as an expert but was not designated as one. However, during trial, defense counsel repeatedly made this objection.

1988)).  "For an indigent defendant to be entitled to public funds to retain an expert, the expert must be a 'basic tool of an adequate defense.'"  *Isham*, 161 So. 3d at 1081 (¶25) (quoting *Lowe*, 127 So. 3d at 182 (¶18)).

¶30.    To establish whether an expert is a "basic tool for an adequate defense," our supreme court, citing the United States Supreme Court in *Ake*, articulated three factors for courts to analyze:

> (1) the private interest that is affected by the action of the state; (2) the governmental interest that is affected if the safeguard is provided; and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Isham*, 161 So. 3d at 1081-82 (¶25) (citing *Lowe*, 127 So. 3d at 182 (¶17)).  Moreover, the defendant must establish a "substantial need" for expert assistance—"undeveloped assertions" that assistance would be beneficial  are insufficient to show that need.  *King v. State*, 960 So. 2d 413, 422 (¶10) (Miss. 2007) (quoting *Holland v. State*, 705 So. 2d 307, 333 (Miss. 1997); *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991)).  "Concrete reasons for requiring an expert must be provided by the accused."  *Barnett v. State*, 192 So. 3d 1033, 1039 (¶18) (Miss. Ct. App. 2015) (quoting *Green*, 631 So. 2d at 171).

¶31.    Our review of the record makes it clear that Mason needed an expert to assist with his defense.  His case was based entirely on the use of computers, software, and specialized networks used to transmit and receive digital images of child pornography without the active participation of a user.  At the hearing on the motion for funds to obtain an expert, defense counsel represented that after viewing the State's evidence at the sheriff's department, she

did not understand the file pathways and programs used in the case. She argued it was specialized knowledge she did not have, although she had some familiarity with computers and knew they could be traced by IP addresses. She requested a computer forensics expert to help her understand what she was looking at and help her assess where the files came from and how they got there. The State countered by having Detective Logan testify on the standard operating procedure for a child pornography case in both state and federal investigations. Detective Logan testified that when Mason's attorney came to his office to view the files, he answered any questions she had and stated he was available to explain how BitTorrent worked. However, defense counsel pointed out that she did not even know the specific questions to ask him in order to advocate for her client or how to cross-examine Detective Logan's technical testimony.

¶32.   In the motion for judgment notwithstanding the verdict or a new trial, defense counsel made several arguments we find persuasive as to why the motion for an expert should have been granted. A computer forensics expert would have determined whether the defense needed to file a motion to suppress the materials gathered by the Torrential Downpour software. Mason could not perform "validation testing" of the software to determine its margins of error and whether it could identify Mason's "online activities amidst multiple source downloads." Further, an expert could determine whether the files shown to the jury were the actual files downloaded by law enforcement from Mason's computer and if Mason authorized the downloads. A defense expert was needed to confirm that the several thousand files at issue were full or partial downloads and to confirm to their location on

Mason's computer. An expert was also needed to explain the meaning and importance of file pathways. Most obviously, an expert was needed to help the court and jury understand the "complexity and inner workings" of Bit Torrent and Torrential Downpour software and refute Detective Logan's testimony.

¶33. The State argues that Mason offered only "undeveloped assertions that assistance would be beneficial" rather than offering "concrete reasons" as to why an expert should be provided, as required by our Supreme Court. We find Mason's assertions for an expert were anything but "undeveloped." Mason's "concrete reasons" for an expert were first articulated in his initial motion approximately six months before trial and continued throughout trial until his post-trial motions. The motion asserted the need for an expert "to examine the software used by the Government . . . to determine the forensic pathways and algorithms allegedly found on Mr. Mason's computer to determine the accuracy of the data that may be presented to a jury," and to adequately question Detective Logan. Further, because of her limited knowledge in computer forensic science, defense counsel noted her services would require "an expert's assistance to determine" pre-trial motions. At the hearing on the motion, defense counsel noted that Mason's computer had "crashed," thus investigators could not create a "clone" of his hard drive; therefore, she contended an expert was needed to testify that the State's evidence (Exhibit 6)—in the form of a screenshot—was the same thing retrieved from Mason's computer. She specifically told the trial court:

> [I]t's an interesting case in the fact that there is no hard copy . . . of my client's computer, and so because I am unfamiliar with the algorithms and the files that I was viewing, I believe that I would need special expertise to show me what exactly was pulled, where it was pulled from, and how to show that

16

those files are files that actually came from my client's computer.

Further, she detailed the need for an expert to testify on IP addresses, file pathways, metadata, software, torrents, and hash values, all of which are highly technical and scientific.

¶34. Mason cites the Mississippi Supreme Court's recent decisions of *Brown*, *Isham*, and *Lowe* in support of his argument for an independent expert.[8] In these cases, the Mississippi Supreme Court reversed the convictions at least in part on trial courts' denials of defendants' request for funds to hire experts because the denials deprived them of a fundamentally fair trial. *Isham*, 161 So. 3d at 1077 (¶1); *Brown v. State*, 152 So. 3d 1146, 1169 (¶99) (Miss. 2014); *Lowe*, 127 So. 3d at 179 (¶2). *Isham* and *Brown* both involved convictions for severe injuries to young children—felonious child abuse and capital murder, respectively. *Isham*, 161 So. 3d at 1078 (¶1); *Brown*, 152 So. 3d at 1149 (¶¶1, 5). In both cases, the State's case was circumstantial and relied on the State's experts. *Isham*, 161 So. 3d at 1083 (¶34); *Brown*, 152 So. 3d at 1164 (¶83).

¶35. In *Brown*, the supreme court held that the trial court's denial of funds for an expert was an abuse of discretion and a denial of due process because the State's expert offered the only evidence on the underlying felony and death, and the defense had no way to challenge it. *Brown*, 152 So. 3d at 1167 (¶93). The supreme court also stated a defense expert was necessary to challenge the State's expert on cross-examination. *Brown*, 152 So. 3d at 1166 (¶92). In *Isham*, the supreme court applied *Brown* and *Lowe*'s holding, stating the "mandate

---

[8] *Barnett*, 192 So. 3d at 1040 (¶¶21-26), provides an in-depth discussion and comparison of these three decisions, where this Court found a defendant failed to articulate a concrete need for an independent forensic pathologist to assist his murder defense.

. . . is abundantly clear: if the State relies on expert testimony alone to prove or corroborate an element of the crime, then the defendant is entitled to an expert to assist in his defense and preparation for cross-examination . . . without which the defendant cannot receive a fair trial." *Isham*, 161 So. 3d at 1083 (¶33). Like *Brown*, the State's experts were the only proof that the child's injuries were from abuse, and without this proof, the State could not prove its case against the defendant. *Id.* at 1083-84 (¶¶34, 38).

¶36. Finally, *Lowe*, which is most similar to this case, reversed the defendant's conviction for five counts of child exploitation by downloading child pornography. However, unlike our case, other individuals had access to and used his computer. *Lowe*, 127 So. 3d at 179-80 (¶¶3-9). The State's expert in computer forensics examined the defendant's laptop to find the files at issue. *Id.* at 179 (¶¶3-4). Before trial, Lowe, in turn, filed several motions for funds for his own expert to refute the State's findings and prepare a defense. *Id.* at (¶4). The trial court denied the motions and instructed Lowe's counsel to speak with the State's expert first. This expert, however, refused to discuss the specifics of his forensic examination and would not meet with Lowe's counsel until two weeks before trial. *Id.* at 180 (¶¶7-8). As here, defense counsel responded that he could not even adequately question the State's expert without assistance from a defense expert. *Id.* at (¶8). At trial, no witness claimed knowledge that Lowe had downloaded the files, but the State's case relied entirely on the testimony of its expert to show that the "digital fingerprint" (times, passwords, and networks associated with the files) pointed to Lowe. *Id.* at 180-81, 183 (¶¶11, 21).

¶37. In reversing Lowe's conviction, our supreme court cited the principles in *Ake*, *supra*

18

¶29, recognizing that "[a] trial court must provide expert assistance to an indigent defendant when denial of such assistance would render the trial fundamentally unfair." *Lowe*, 127 So. 3d at 181 (¶13). The State relied solely on its expert to show that the files existed on Lowe's laptop and that Lowe himself actually downloaded the images. *Id.* at 183 (¶21). Importantly, the State could not have convicted Lowe without its expert, but Lowe had no means to cross-examine or refute the testimony. *Id.* at (¶¶21-22). Like here, defense counsel also repeatedly argued to the trial court the specific needs for an expert to no avail. *See id.* at (¶22).

¶38. The State argues that the application of *Lowe* does not justify a new trial, as Mason contends, because the State did not rely on an expert. Further, the State contends Mason did not need an expert to assist in his defense "because there was no question" that he downloaded and shared the material.[9] We disagree and find *Lowe* is analogous to this case.

¶39. As discussed above, Detective Logan should have been considered an expert due to his highly technical testimony. However, regardless of Detective Logan's designation as an expert, all the evidence against Mason came from the State's sole witness; accordingly, Mason needed an expert to challenge Detective Logan's testimony on cross-examination. Similar to *Lowe*, even though the State allowed defense counsel to question Detective Logan about how the technology worked, that was not equivalent to having a defendant's own independent expert. Further, as in *Lowe*, defense counsel repeatedly objected to Detective

---

[9] The supreme court reversed this Court's opinion affirming the conviction, *see Lowe v. State*, 178 So. 3d 760, 766 (¶20) (Miss. Ct. App. 2013), *rev'd*, 127 So. 3d 178 (Miss. 2013), where we erroneously found Lowe failed to provide a specific, substantial need for an expert or show that he was prejudiced by the absence of an expert.

Logan's testimony and renewed her request for an expert several times throughout the trial. Finally, here, even more so than in *Lowe*, the specific, substantial reasons given by the defense counsel weighed heavily in favor of a state-funded defense expert under *Ake*.

¶40. The trial court's denial of funds for an expert deprived Mason of a fundamentally fair trial. "The probable value of an independent defense expert" weighed heavily in favor of Mason because the entire case dealt with complex computer issues and specialized network technology. Before, during, and after trial, Mason provided concrete and substantial reasons that he required the assistance of an expert as a "basic tool of an adequate defense." Even though Detective Logan was not considered an expert by the State, his testimony showed otherwise. Therefore, the trial court abused its discretion in denying Mason's motion for funds to retain an expert.

### C. The lack of a defense expert hindered Mason's jurisdictional challenge.

¶41. On appeal, Mason does not raise the issue of lack of jurisdiction in Mississippi; however, he unsuccessfully raised the issue before the trial court in both his motion for a directed verdict and post-trial motion. Our concern is with the lack of a defense expert to assist him in challenging jurisdiction over a defendant in Tennessee being convicted in Mississippi because of Torrential Downpour data.

¶42. When Detective Logan downloaded the materials from Mason's computer, the computer was located in Cordova, Tennessee, where Mason resided. Detective Logan submitted documents for the Memphis Police Department to obtain a search warrant of Mason's home. Computer items were seized by the Memphis Police Department and later

20

sent to the DeSoto County Sheriff's Department in Mississippi. Another search warrant was obtained by the DeSoto County Sheriff's Department to examine Mason's computers. Mason never transported his computer to Mississippi; the State of Mississippi transported it. Ultimately, an arrest warrant was issued for Mason in DeSoto County, Mississippi.

¶43. Mississippi Code Annotated section 97-5-33(9) provides, "For purposes of determining jurisdiction, the offense is committed in this state if all or part of the conduct described in this section occurs in the State of Mississippi or if the transmission that constitutes the offense either originates in this state *or is received in this state*." (Emphasis added).[10] Mason did not challenge the constitutionality of this statute. Detective Logan's computer, which received child pornography files from Mason's computer, was located in DeSoto County. Over the defense's objection, Detective Logan testified about how law enforcement's use of Torrential Downpour in DeSoto County allowed them to receive Mason's files. However, an expert for the defense would have been useful in further challenging jurisdiction, as there appears to be a question of what exact criminal act by Mason occurred in Mississippi. The only acts in Mississippi appear to be those taken by Detective Logan; an expert could have helped defense counsel understand the technology that created jurisdiction across state lines and whether it could be successfully challenged.

## II. Evidentiary Errors

¶44. Another concern is that Detective Logan's testimony received the benefit of being treated as expert testimony by the trial court without his being designated as an expert. This

---

[10] Additionally, the jury was given an instruction on jurisdiction that tracked the language of this statute.

error adds to our concern that Mason did not receive a fair trial.

¶45.    For example, Detective Logan's summary of the National Center for Missing and Exploited Children's (NCMEC) child identification report was entered into evidence as Exhibit 8, over defense counsel's repeated objection.  Detective Logan testified he had created the report from information provided by NCMEC.  In his report, he identified about eighteen children in the videos found on Mason's computer that were part of NCMEC's actual report.  Defense counsel objected on the grounds of hearsay and Detective Logan's not being designated an expert.  She claimed the report was not the best evidence, and the jury should be able to consider the NCMEC's entire report.  Additionally, Detective Logan could not confirm that he had independently verified that the children listed in the report were actual victims.[11]

¶46.    This issue is similar to an issue raised on appeal regarding the three expert witnesses in *Travelstead*.  The Court explained that the NCMEC "collects and stores images or photos of past victims of child pornography into a database to catch future perpetrators."

---

[11] In another example, Detective Logan created a Word document that listed file paths and file names that contained child pornography with a brief explanation of their contents. This document was admitted into evidence as Exhibit 4 over defense counsel's objection that there was an insufficient foundation laid, as well as Detective Logan's not being designated an expert.  Most persuasively, defense counsel objected due to inadequate authentication because Detective Logan could not prove the files on his list were the same files he retrieved from Mason's computer because "certain digital fingerprints . . . must occur."  Defense counsel also pointed out a chain-of-custody issue, as the computer came from Tennessee, and the defense was unsure if any computer forensics occurred or if files had been manipulated during the investigation.  Additionally, Mason's computer crashed during the forensic examination. The trial court overruled the objection, instructing defense counsel to address these issues on cross-examination.  Without his own expert, such cross-examination was not compelling.

*Travelstead*, 232 So. 3d at 756 (¶7). The agent there used the database to identify several "known images" found on the defendant's computer and classify the photos as child pornography. *Id.* at (¶¶7-8). On appeal the defendant argued the agents' testimony on the "known images" was hearsay. *Id.* at (¶8). Ultimately, the "known images" were considered admissible because "[e]xpert witnesses are allowed to rely on information from other witnesses." *Id.* at (¶9). The experts "were entitled to rely on information from other sources to form their opinions, even though they did not personally create that information." *Id.* at 757 (¶10).

¶47. Here, any evidentiary issue with Exhibit 8 could have been alleviated if Detective Logan had been designated as an expert because he could have relied on the information from other sources to form his opinion that he had identified eighteen children's identities. In effect, the State was given a procedural advantage of using expert testimony without actually designating an expert.

## CONCLUSION

¶48. The trial court's denial of funds for an independent defense expert denied Mason a fundamentally fair trial. We also note other evidentiary errors made at trial that contributed to an unfair trial. Accordingly, we reverse Mason's conviction and remand the case for a new trial.

¶49. **REVERSED AND REMANDED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. WILSON, P.J., SMITH AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

23